**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Alvin TOLLIVER, Jose Antonio Perrett, Amalio Galvan-Venegas, Willie Ernest Scott and Angela Faye Onick, Defendants-Appellants.**

No. 85–1183.

United States Court of Appeals,
Fifth Circuit.

Jan. 16, 1986.

Rehearing and Rehearing En Banc
Denied March 11, 1986.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Alvin Tolliver, Jose Antonio Perrett, Amalio Galvan-Venegas, Willie Ernest Scott, and Angela Faye Onick were tried and convicted of conspiracy to possess heroin with intent to distribute it in violation of 21 U.S.C. § 841(a)(1), and of possession with intent to distribute heroin and aiding and abetting in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. All defendants appeal, challenging the prosecution's use of peremptory challenges during voir dire to strike minorities from the jury panel, and the admission at trial of evidence that they assert was seized during arrests unsupported by probable cause.

Donald S. Gandy, Fort Worth, Tex., Craig Washington, Houston, Tex., for Tolliver.

David R. Bires, Houston, Tex., for Perrett.

Tim Evans (Court-appointed), Fort Worth, Tex., for Galvan-Venegas.

Louis E. Sturns (Court-appointed), Fort Worth, Tex., for Scott.

Tarlton, Douglas, Gressler & Wuester, William O. Wuester (Court-appointed), Fort Worth, Tex., for Onick.

Marvin Collins, U.S. Atty., Dallas, Tex., Terence J. Hart, Asst. U.S. Atty., Fort Worth, Tex., for the U.S.

Before REAVLEY, WILLIAMS, and HIGGINBOTHAM, Circuit Judges.

## I

The investigation began in early 1981, when DEA Agent Tom Waddill first became aware of defendant Alvin Tolliver during an undercover drug buy at which Tolliver was present. The next year, Waddill learned that Tolliver was managing the Double Feature club in Fort Worth, Texas, whose building was owned by Donnie Harper, a known drug dealer. Informants told Waddill that Tolliver was one of Harper's lieutenants, and that he was dealing large amounts of heroin and cocaine in Fort Worth.

Waddill learned from the FBI that Harper was depositing large amounts of cash in a local bank, and that he had a "Page-A-Fone" beeper, number 5047. Through a subpoena, Waddill obtained the records of beeper number 5047 from Page-A-Fone, and found numerous messages from beeper number 5107. According to the records, that beeper belonged to Alvin Tolliver, who was receiving up to forty-five messages a night, mostly from people in the drug trade.

The message slips included several from "Juan"; the call-back number on one of those slips was to Room 119 at the Caravan Motel in Fort Worth, which was registered at the time to defendant Jose Antonio Perrett. Perrett had been arrested with sever-

al others in May, 1980 for possession of approximately nine ounces of Mexican heroin. Later messages left by "Juan" with callbacks to the Caravan were to rooms registered in the name of defendant Amalio Galvan.

In January 1983, after learning that "Juan" had called Tolliver, Waddill and Fort Worth police set up surveillance at the Caravan Motel and observed Tolliver and Galvan arrive in separate cars and enter a room at the motel. Tolliver left the room shortly thereafter and drove away, but no apparent illegal activity was observed.

On September 12, 1983, Agent Waddill learned that Tolliver had received another beeper message from "Juan," with a callback to Room 109 at the Caravan Motel. Waddill called the motel management, learned that Room 109 was registered to two people in the name of Amalio Galvan, and obtained the license plate number of the car listed on the motel registration card. Waddill requested that Fort Worth police officer Michael DeLaFlor accompany him in a separate car to the Caravan. While driving to the motel, Waddill learned that the car registered to Galvan belonged to Maricela Barrera de Perrett, the wife of Jose Antonio Perrett.

When Waddill arrived at the Caravan, he requested and received a room with a clear view of Room 109. He established surveillance with three Fort Worth police officers. They observed Galvan leave Room 109 and drive away alone in a Chevrolet Caprice. Shortly thereafter, Alvin Tolliver, who was carrying a bulging leather camera bag over his shoulder, walked across the motel parking lot and entered Room 109.

Defendant Angela Faye Onick then arrived in a Mercury automobile and backed into a parking spot in front of Room 109. The officers saw defendant Willie Ernest Scott, walking the same path that Tolliver had taken earlier, get in the back seat of the car. A check on Onick's vehicle revealed that it was registered to Barbara Carr, Tolliver's common law wife.

Within minutes, Tolliver left Room 109 carrying the leather camera bag, which he threw in the back seat of the Mercury. After a brief conversation with Tolliver, Onick left the car, walked with Tolliver to the restaurant area of the motel, and then returned to the car with him, getting into the driver's seat. Scott got out of the back seat, spoke briefly to Tolliver, and sat in the front passenger seat. As Onick drove out of the motel parking area, Tolliver returned to Room 109.

Believing a drug transaction had taken place, Waddill and other officers followed Onick's car to a drugstore parking lot a quarter mile from the motel. As Scott and Onick were getting out of the car, Waddill and the officers approached and identified themselves. Waddill retrieved the brown leather bag from the back seat of the Mercury, expecting to find narcotics; the bag, however, was empty. Seeing a small bulging change purse resting on the console between the two front bucket seats of the car, Waddill inspected it; he discovered $849 in cash and a small plastic baggie of white powder sealed with a rubber band. Waddill then instructed one of the Fort Worth officers to conduct an inventory search of the automobile. The officer opened the driver's door and discovered, at the crack on the driver's seat where the backrest and lower seat met, both a small clear gelatin capsule containing a white powder and a wadded, cellophane-wrapped ball of brown paper containing a dark gummy substance. These items were given to Waddill, Onick and Scott were arrested, and the Mercury was secured and left in the parking lot.

Waddill took the seized items to Room 126 of the Caravan, where they were field tested. The white powder in both the bag and the capsule tested positive for cocaine, and the dark gummy substance tested positive for heroin.

Galvan was then observed returning to the Caravan in the Chevrolet Caprice and entering Room 109. Within a few minutes, Galvan, Tolliver and Perrett left Room 109 and got in the Chevrolet. Waddill and the officers approached the car with guns drawn, identified themselves, and asked all

three men to get out of the vehicle. As the officers approached the men to pat them down for weapons, Tolliver made a quick move, reaching down to the inside of his left ankle. Suspecting that he had a weapon concealed in an ankle holster, two officers grabbed him, held him on the hood of the automobile, handcuffed him, and inspected the area he was reaching for. Tolliver was wearing two socks on his left foot; between them at his ankle was a substance wrapped in plastic, brown paper, and tape. Officer DeLaFlor removed part of the wrapping, revealing a dark gummy substance. Galvan and Perrett were both patted down; $19,000 in cash was found in Galvan's boots, and $19,770 was found in the boots and pockets of Perrett. All three men were arrested.

Laboratory tests established that both the substance in the package seized from Tolliver and the dark gummy substance found in Scott and Onick's vehicle were heroin with a purity of about 65%. The net weight of the heroin discovered on Tolliver was 123.6 grams, or approximately 4.4 ounces. Evidence at trial established that the wholesale value of 65% pure heroin was approximately $10,000 an ounce, making the heroin seized from Tolliver worth at least $40,000; the evidence also showed that the heroin could be cut to 3% or 4% purity, and divided into units of .1 gram selling for $20 apiece, placing its potential street value in the neighborhood of $500,-000.

The capsule found in the Mercury contained .121 grams of 34% pure cocaine. The white powder in the baggie found in the small change purse proved to be lactose, a non-controlled substance sometimes used to cut heroin and cocaine.

An inventory search of the trunk of the Mercury used by Scott and Onick turned up a blender, a strainer, a spoon, a battery-operated digital scale, a shaving kit with miscellaneous personal items, and a bank bag containing a loan book and a medical bill with the name "Lola Onick" on them. Chemical analysis of the blender jar showed it contained a small amount of heroin residue.

Tolliver, Perrett, Galvan, Scott and Onick were indicted on two counts. The first charged them with conspiracy to possess heroin with intent to distribute in violation of 21 U.S.C. § 846. The second count charged each with possession of heroin with intent to distribute, and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

The defendants questioned the legality of all the searches and filed motions to suppress all evidence seized in connection with both sets of arrests. Following a suppression hearing, the district court denied all motions to suppress, and a jury trial was held. All defendants were found guilty on both counts.

## II

■ Defendants first contend that the government's use of peremptory challenges to strike minority members from the venire deprived them of a fair and impartial jury as guaranteed by the sixth amendment.

It is undisputed that all defendants are either black or hispanic, and that of the eight peremptory challenges allowed the government, six were used to remove all black and hispanic veniremen. As a result, defendants were tried before an all-white jury. After the jury was selected, defense counsel moved to quash the panel. No evidence of routine or systematic exclusion of blacks from petit juries was presented, and the motion was denied.

In *Swain v. Alabama,* 380 U.S. 202, 227, 85 S.Ct. 824, 839, 13 L.Ed.2d 759 (1965), the Supreme Court held that in order to establish a valid constitutional claim of invidious racial discrimination by a prosecutor in the selection of jurors, "the defendant must show the prosecutor's systematic use of peremptory challenges against Negroes over a period of time." In *Prejean v. Blackburn,* 743 F.2d 1091, 1104 (5th Cir. 1984), *modified,* 765 F.2d 482 (5th Cir. 1985), we determined that a showing that the prosecutor had exercised his peremptory challenges to exclude all blacks from the

jury panel in one case was insufficient under *Swain* to raise a constitutional issue. We held that there must be "a particularized showing that the prosecution has engaged in the systematic, invidious use of peremptory challenges." *Id.*, 743 F.2d at 1104. Defendants in this case made no showing of systematic exclusion of minorities from juries over a period of time. The issue is now before the Supreme Court, *Batson v. Kentucky, cert. granted,* —— U.S. ——, 105 S.Ct. 2111, 85 L.Ed.2d 476 (1985), but under the current law of this circuit the motion to quash the jury was properly denied.

### III

Defendants Onick and Scott argue that their arrests in the drugstore parking lot were unsupported by probable cause, and that the district court erred in denying their motion to suppress all evidence seized in connection with that arrest. Because we find that there was insufficient evidence at trial to sustain their convictions on either count of the indictment, we do not reach the issue of whether there was probable cause for their arrests.

On appeal, the standard of review of the sufficiency of the evidence in a criminal case is whether a "reasonable trier of fact could [have found] that the evidence establishe[d] guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 680 (1983). In evaluating a claim of insufficient evidence according to this standard, we view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.2d 680 (1942).

While the government joined issue at oral argument with both Onick and Scott as to the sufficiency of the evidence to support their convictions, the record is uncertain regarding Onick's assertion of the point to the trial court. At times during trial, each defendant adopted the objections and motions of the others, but we are unsure which defendants raised the sufficiency point. Regardless, we are persuaded that Scott preserved the point at each turn; while Onick may not have done so, it would on this record be a manifest miscarriage of justice not to give similar treatment to the identically situated defendants. *See United States v. Dominguez,* 615 F.2d 1093, 1097 (5th Cir.1980).

### A

■ Defendants Scott and Onick were charged in the first count of the indictment with conspiracy to possess heroin with intent to distribute. In a conspiracy prosecution under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt both the existence of an agreement between two or more persons to violate the narcotics laws, and that each conspirator knew of, intended to join, and participated in the conspiracy. *United States v. Michelena-Orovio,* 719 F.2d 738, 742 (5th Cir.1983) (en banc), *cert. denied,* 465 U.S. 1605, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984); *United States v. Vergara,* 687 F.2d 57, 60–61 (5th Cir. 1982). No showing of an overt act is necessary in a drug conspiracy prosecution, and the "agreement between the coconspirators and defendant need not be proved by direct evidence, but may be inferred from concert of action." *Vergara,* 687 F.2d at 61. Of course, presence at the scene of the crime or close association with a co-conspirator alone will not support an inference of participation in a conspiracy. *Vergara,* 687 F.2d at 61.

■ Viewing the record in the light most favorable to the government, we find the evidence insufficient to support a conspiracy charge against either Scott or Onick for possession of heroin with intent to distribute. As is typical in this kind of case, there was no direct evidence that either of these two defendants were part of any agreement to violate the narcotics laws, and the government had to rely exclusively on circumstantial evidence. Most of this circumstantial evidence did no more than place Scott and Onick at the motel, where they briefly associated with the other defendants. As a whole, the evidence was

insufficient to prove beyond a reasonable doubt that they were part of the charged conspiracy.

The government argues that among Tolliver's "Page-A-Fone" records were several messages from a "Willie," and that these support an inference of conspiracy, at least as to Willie Ernest Scott. However, the evidence at trial indicated that at least two other members of the "drug community" were known as "Willie" and that no attempt was made to link the telephone numbers on the messages to any number accessible to Scott.

The government's strongest evidence of a conspiracy between Scott or Onick and the other defendants was the small sample of heroin, with the same purity as that of the heroin seized in the arrest of the three other defendants, which was found on the driver's seat of the vehicle they were traveling in. However, neither Scott nor Onick had the heroin on their person or in any container or purse shown to have been owned by either of them, nor was either ever proved to have touched or handled it at any time. No evidence established how the heroin sample got in the Mercury or how long it had been there. The vehicle in which it was found was not registered to either Scott or Onick, but to Tolliver's wife. No evidence directly indicated that either defendant was aware of the heroin's presence: there was no furtive attempt to hide or destroy it on seeing the approach of the officers, and it was found in an inconspicuous location at the crack between the backrest and seat cushion where neither defendant would have been likely to notice it during a short trip. Significantly, the relation of these small quantities to the activities of Tolliver, Perrett, and Galvan-Venegas is left to surmise.

As to the items found in the trunk of the vehicle during the inventory search conducted after it was impounded, we find similar difficulties in viewing them as providing the conspiratorial link between Scott and Onick and the others. The only item connected on its face to either was the bank bag containing a payment book and a medical bill belonging to a "Lola Onick." The last entry in the payment book was in December 1982, nine months prior to the arrest. The shaving kit, on the other hand, clearly was Tolliver's, and contained items of jewelry belonging to him. No evidence established that Scott or Onick had access to the trunk or the items in it, and nothing indicated how recently the payment book and medical bill belonging to someone with Onick's last name had been placed there. No connection was proved between the other items in the trunk and either Scott or Onick.

In the absence of additional evidence providing a link between the other defendants' illegal activities and Scott and Onick, we are persuaded that a reasonable jury would have entertained a reasonable doubt as to whether Scott and Onick conspired to possess and distribute heroin as charged in the first count.

**B**

The second count of the indictment charged Scott and Onick with both possession of a controlled substance with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1), and aiding and abetting, in violation of 18 U.S.C. § 2.

Three elements must be proven to sustain a conviction for possession of heroin with intent to distribute: "(1) knowing (2) possession of heroin (3) with intent to distribute it." *United States v. Richards*, 638 F.2d 765, 768 (5th Cir.), *cert. denied*, 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981). The possession may be actual or constructive, may be joint among several defendants, and may be proved by either direct or circumstantial evidence. Constructive possession is defined as "'the knowing exercise of, or the knowing power or right to exercise, dominion and control over the proscribed substance,'" *United States v. Glasgow*, 658 F.2d 1036, 1043 (5th Cir.1981) (quoting *United States v. Marx*, 635 F.2d 436, 440 (5th Cir.1981)), and may be established by "dominion or control over the premises or the vehicle in which the contraband was concealed," *United States*

*v. Moreno,* 649 F.2d 309, 312 (5th Cir.1981) (quoting *United States v. Martinez,* 588 F.2d 495, 498 (5th Cir.1979)). However, "mere presence in the area where the narcotic is discovered or mere association with the person who does control the drug or the property where it is located, is insufficient to support a finding of possession." *United States v. Moreno,* 649 F.2d 309, 312 (5th Cir.1981) (quoting *United States v. Stephenson,* 474 F.2d 1353, 1355 (5th Cir. 1973)).

██ The charge of aiding and abetting possession of heroin with intent to distribute required proof of "(1) aiding and abetting the possession and (2) aiding and abetting the intent to distribute." *United States v. Aguirre Aguirre,* 716 F.2d 293, 298 (5th Cir.1983). "To aid and abet, the defendant must wilfully associate himself in some way with the criminal venture and wilfully participate in it as he would in something he wished to bring about." *Id.*

██ The government argues that both the contraband found in the vehicle and the heroin found on the person of Tolliver provide a basis for Scott and Onick's convictions for possession with intent to distribute. The government's theory for charging Scott and Onick with possession of the heroin held by the other three defendants is apparently an application of the *Pinkerton* principle: "that a party to a continuing conspiracy may be responsible for a substantive offense committed by a coconspirator in furtherance of the conspiracy, even though that party does not participate in the substantive offense or have any knowledge of it." *United States v. Michel,* 588 F.2d 986, 999 (5th Cir.) (citing *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). Because we have determined that the conspiracy count against both Scott and Onick must fail, the *Pinkerton* principle cannot apply to find them guilty of a substantive offense based upon the heroin found on the person of Tolliver.

██ A similar conclusion must be reached as to the charge against defendants Scott and Onick for aiding and abetting the heroin possession of the other three defendants. As discussed above, the government has shown little more than presence and association, which is insufficient to sustain a conviction for possession with intent to distribute, even on an aiding and abetting theory. *See United States v. Acosta,* 763 F.2d 671, 682 (5th Cir.), *cert. denied sub nom. Weempe v. United States,* — U.S. ——, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985).

██ As to the narcotics found in the vehicle occupied by Scott and Onick, we have concerns similar to those we discussed in connection with the alleged conspiracy—that is, the paucity of evidence indicating awareness by either Scott or Onick of the contraband's presence in a vehicle they did not own and were not shown to have controlled for more than a brief period. Moreover, although defense counsel elicited on cross examination the gross weight of the entire package of heroin seized from the vehicle, our review of the record indicates that the government did not put on any proof as to its net weight. Absent such proof, the jury could not presume that the amount of heroin in the package was sufficiently large to support an inference of intent to distribute. Had the government proceeded against Scott and Onick on a simple possession charge, it might have succeeded without proving the net weight of the seized heroin. However, the evidence was insufficient to establish possession with intent to distribute.

We therefore must reverse the convictions of Scott and Onick on all counts.

## IV

The remaining defendants, Tolliver, Perrett and Galvan-Venegas, each assert that neither the arrest of Onick and Scott nor their own arrests were supported by probable cause, and that all evidence seized during either arrest should have been suppressed.

██ We first address the question of Tolliver, Perrett and Galvan's standing

to challenge the legality of the arrests of Scott and Onick. The blunt answer is that they have none. The fourth amendment confers personal rights that may not be vicariously asserted: "since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment ... it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425–26, 58 L.Ed.2d 387 (1978) (citation omitted). Since these defendants had no standing to challenge the admissibility at trial of evidence seized in the initial arrests of Scott and Onick, *see Wong Sun v. United States*, 371 U.S. 471, 491–92, 83 S.Ct. 407, 419–20, 9 L.Ed.2d 441 (1963), it follows *a fortiori* that even if the evidence was illegally seized from the first two suspects, it was proper for the police to use that evidence in determining whether there was probable cause for the subsequent arrest of the other three suspects.

Probable cause for an arrest exists when "the facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant in a person of reasonable caution the belief that an offense has been or is being committed." *United States v. Woolery*, 670 F.2d 513, 515 (5th Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982). Far less evidence is necessary to establish probable cause than to support a conviction. *United States v. Ashcroft*, 607 F.2d 1167, 1170 (5th Cir.1979), *cert. denied*, 446 U.S. 966, 100 S.Ct. 2944, 64 L.Ed.2d 826 (1980). In determining probable cause, "we must take into account the experience of the agents," since " '[c]onduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer.' " *Woolery*, 670 F.2d at 515 (quoting *United States v. Clark*, 559 F.2d 420, 424 (5th Cir.), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977)).

In this case, several years of investigation had already established Tolliver's high profile in the illegal drug business in Fort Worth. Perrett had a previous arrest record for possession of heroin. Tolliver, Perrett, and Galvan were linked through Tolliver's Page-A-Fone records, and Tolliver and Galvan had been observed meeting at the Caravan Motel on a prior occasion. On the day of the arrest, Tolliver was seen entering Room 109 of the motel with a bulging leather bag, which was found to be empty during Scott and Onick's arrest, leading to a reasonable suspicion that drugs or money it may have contained were still in Tolliver's possession or had been given to the remaining two suspects. The Mercury driven by Scott and Onick was registered to Barbara Carr, Tolliver's common law wife, and in it were found three items of contraband that field-tested positive for heroin or cocaine. Agent Waddill and the other officers could reasonably have believed that a narcotics transaction had or was about to take place, and probable cause existed for the three defendants' arrest. The district court did not err in denying defendants' motion to suppress the evidence seized during their arrests. The convictions of Tolliver, Perret, and Galvan-Venegas are therefore affirmed.

AFFIRMED IN PART; REVERSED IN PART.