**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Abel A. SANDOVAL, Napoleon Garcia-Martinez and Efrain Lucero,
Defendants-Appellants.**

No. 87–2475.

United States Court of Appeals,
Fifth Circuit.

June 6, 1988.

Rehearing Denied July 6, 1988.

Roberto J. Yzaguirre, McAllen, Tex., for Abel A. Sandoval.

Jose E. Chapa, Jr., McAllen, Tex., for Napoleon Garcia-Martinez.

Heriberto Medrano, Harlingen, Tex., for Efrain Lucero.

Cedric Joubert, James R. Gough, Asst. U.S. Attys., Houston, Tex., for U.S.

Before WISDOM, RUBIN, and JONES, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Three defendants challenge their convictions for conspiracy to possess cocaine with intent to distribute it and aiding and abetting the distribution of cocaine. They argue that the evidence was insufficient to support their convictions; the jury was irreparably prejudiced against them because counsel for a co-defendant raised at voir dire the possibility of his client pleading entrapment and because the co-defendant pleaded guilty shortly thereafter; and the district court abused its discretion when, in response to the jury's request during deliberations, it reread testimony that the defendants claimed damaged their case and received greater emphasis because of its being reread. Finding no reversible error on any of these contentions, we affirm the convictions.

I.

The government's case rested chiefly on the testimony of federal and local narcotics officers and of Francisco Villarreal, a member of the alleged drug conspiracy who had pleaded guilty and turned state's evidence. Their testimony, credited as true, established the following:

Undercover agents of the Drug Enforcement Administration received a tip from a confidential informer that Ovidio Rodriquez and other men were trafficking in marijuana and cocaine and were seeking buyers. After a preliminary meeting to set price and quantity, and several phone calls between agents and another man, Villarreal, it was agreed that the sale would take place at the Holiday Inn in Rosenberg, Texas, near Houston. Before then, Rodriquez and Villarreal had met with two other men, Artemio Cantu and Napoleon Garcia-Martinez, at Garcia's house to plan the sale, and Garcia had told Rodriquez that the cocaine was already in Houston and he was "ready to do business."

On the agreed date, Garcia picked up Rodriquez, Cantu, and Villarreal and drove them in a passenger van to the Holiday Inn, where they arrived late in the evening and checked in under Cantu's name. Garcia then drove with Villarreal to Houston and met Efrain Lucero, whom Villarreal testified he had never seen before. After a brief conversation with Lucero, out of Villarreal's earshot, Garcia told Villarreal the "business" was arranged. A short time later, at a motel near the Houston airport, they again met Lucero, who this time was accompanied by Abel Sandoval. Garcia and Lucero went to the washroom together for 5 to 10 minutes, but again Villarreal could not tell whether or on what they conversed. Lucero and Sandoval then left, and 10 or 15 minutes later Garcia received a phone call, the substance of which, again, Villarreal could not hear. Villarreal then drove himself and Garcia back to the Holiday Inn.

Meanwhile, the DEA undercover agents checked into the Holiday Inn and, as had been arranged, met Rodriquez and Cantu in Cantu's room. Over the next few hours, the cocaine did not come and the agents feigned impatience, but Rodriquez repeatedly assured them that Villarreal was on his way with the cocaine. At about 3:15 in the morning, Villarreal and Garcia ar-

rived in the van and stopped in front of the hotel. A DEA agent checked the van but found no cocaine and asked Villarreal where the drugs were. Villarreal, relying on statements Garcia had made to him in the van on the way back to the Holiday Inn, informed the agents that the cocaine would follow shortly. Villarreal then drove the van around to the back of the motel, parked opposite Cantu's room, picked up a suitcase he had brought with him, and went up to the room.

About a half hour after Villarreal and Garcia had arrived, a dark Ford Bronco drove into the parking lot, let off Lucero opposite Cantu's room, and then parked next to the van. Agents observed Lucero standing on the driver's side of the Bronco, between the Bronco and the van, and then walking upstairs to Cantu's room. According to Villarreal, Lucero there spoke briefly in private to Garcia.

The agents outside then approached the Bronco, but Villarreal, who by this time was standing on the balcony with Cantu, Garcia, and Lucero, called out that the "stuff" was in the van. As the agents approached the van, the driver of the Bronco drove out of the parking lot. The agents found the van locked, but Lucero handed Villarreal some keys and Villarreal tossed them down. The agents found a suitcase in the van containing eight kilograms of cocaine. They then arrested Rodriquez, Villarreal, Cantu, Garcia, and Lucero.

Shortly after the arrests, a Spanish-speaking man called the motel room and asked for Lucero, stating that he was the person who had dropped off Lucero. The agent who answered the phone told the caller to come and pick up Lucero, but the caller declined, saying that Lucero had his number and should call him. Speculating that the caller might have used a pay phone and might still be in the area, the agents began searching for the Bronco. They found a dark colored Bronco at a convenience store across the highway from the Holiday Inn, and they arrested its driver, Sandoval.

After the agents had arrested Sandoval, the agent who had received the phone call to the motel room identified Sandoval's voice as the caller's. In an inventory search of the Bronco, the agents found a pistol, a cellular telephone, hotel receipts, and a police scanner. Telephone records later showed that two calls had been placed that night from the cellular telephone to the Holiday Inn, one at about the time the man had called the motel room asking for Lucero.

All of the defendants were charged with (1) conspiracy to possess cocaine with intent to distribute it and (2) aiding and abetting the distribution of cocaine. They were to be tried jointly, the district court having denied Lucero's motion for severance. At voir dire, Rodriquez's lawyer brought up the defense of entrapment, briefly describing the law governing that defense and asking the veniremembers if they could follow it. He did not, however, argue that Rodriquez had been entrapped. After voir dire, Rodriquez and Villarreal pled guilty, and Villarreal turned state's evidence. After a one-week trial, the jury convicted Sandoval, Garcia, Lucero, and Cantu on both offenses. Cantu does not appeal.

## II.

All three appellants contend that the district court should have granted a mistrial and empaneled a new jury because actions by Rodriquez and his counsel prejudiced the jury against them. They argue, in effect, that: (1) counsel's comments and questions concerning entrapment led the jury to conclude that a conspiracy existed and to disbelieve the remaining defendants' protestations that they had not been involved in it; (2) Rodriquez's guilty plea confirmed this inference and further prejudiced the jury; (3) Rodriquez exercised some peremptory strikes they would not have, causing them to lose some of their peremptories since the total strikes were allocated among all defendants. Our inquiry concerning each of these contentions is whether the district court abused its

discretion in denying the defendants' motions.[1]

■ Concerning the allegedly prejudicial comments on entrapment, the assertion of inconsistent arguments by co-defendants does not require severance or a mistrial unless the defenses are "antagonistic to the point of being mutually exclusive or irreconcilable," so that "the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." [2]

■ Under these stiff standards, the claim that the voir dire comments on entrapment prejudiced the other defendants is meritless. First, Rodriquez did not actually present an entrapment defense. Although the defendants assert that Rodriquez's counsel "discussed at length the possibility of Rodriquez raising the defense of entrapment," counsel did no more than describe the law of entrapment briefly and inquire of the veniremembers whether they could follow it:

> You have no doubt heard of something we call entrapment. What entrapment means in lay terms is whether the government convinces an individual to participate in a crime. Specifically what the law provides is that where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or agents or government informants to commit a crime, that person is a victim of entrapment. And the law as a matter of policy forbids his conviction in such a crime.
> I know you have probably all heard of the DeLorean case. That is an example of what we talk about when we talk about entrapment.
> I would ask if anybody believes that if you heard evidence that, in fact, a person

was involved in a drug transaction, but was convinced to become involved in that transaction by a government agent or informant, whether they would have any problem with finding that person not guilty? Another way of phrasing that question might be do you disagree with the DeLorean verdict? Is there anybody who feels they could not follow the law of entrapment?

Rodriquez then pleaded guilty before the jury was empaneled and before presenting any evidence.

In *United States v. Almeida-Biffi*, [3] the co-defendant's counsel raised in his opening statement a defense that Almeida alleged, on appeal, was inconsistent with his own. Thereafter neither side referred to the defense. This court found that Almeida had not demonstrated the "extreme prejudice" required to justify a severance or mistrial.[4] The comments at voir dire in this case were even more tangential to the defendants' trial. Although Rodriquez's counsel defined entrapment and suggested it would be relevant to the case, he never reached the point of arguing to the jury that Rodriquez had been entrapped or presenting any facts in support of such a contention.

Moreover, the entrapment defense, even if fully presented, would not have been "mutually exclusive" of the other defendants' arguments. The entrapment defense, if presented, would have presupposed that the drug conspiracy existed and the transaction occurred.[5] Sandoval, Garcia, and Lucero did not, however, deny these facts; they denied only that the facts showed that they had known of the conspiracy or had joined in it. The jury could have believed that Rodriquez had been entrapped into the transaction but that the others had not known of or joined in the conspiracy. For this reason, a conspiracy co-defendant's en-

1. *United States v. Almeida-Biffi*, 825 F.2d 830, 832–33 (5th Cir.1987).

2. *Id.* at 833 (*quoting United States v. Berkowitz*, 662 F.2d 1127, 1133, 1134 (5th Cir. Unit B 1981); *United States v. Romanello*, 726 F.2d 173, 174 (5th Cir.1984)).

3. 825 F.2d 830.

4. *Id.* at 833 (*citing United States v. Mota*, 598 F.2d 995, 1000 (5th Cir.1979), *cert. denied*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980)).

5. *Mathews v. United States*, —— U.S. ——, ——, 108 S.Ct. 883, 886–87, 99 L.Ed.2d 54 (1988) (*citing Russell v. United States*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973)).

trapment defense is generally not "irreconcilable" with other defendants' claims that they were merely present at the transaction or associated with the conspirators.[6]

■ We turn to the contention that Rodriquez's guilty plea prejudiced the jury. In *Almeida-Biffi*, the trial court had dismissed the indictment against the co-defendant, Almeida's wife, for lack of evidence. The court then instructed the jury "directly and strongly" that it was not to speculate why the wife had been dismissed.[7] Under these circumstances, we found the defendant had not suffered prejudice.

The district court here gave no such cautionary instruction. It did, however, tell the jury that Rodriquez was no longer a party and that it should not draw any inferences from the seating arrangements in the courtroom, under which Rodriquez had been sitting next to the other defendants. In addition, the court later admonished the jury to consider the evidence against each defendant separately and not to speculate on matters not in evidence. Although it would have been preferable for the district court unambiguously to tell the jury at the time of the guilty plea not to draw any inferences from Rodriquez's dismissal, the court did not abuse its discretion in denying a mistrial, considering the cumulative instructions it gave throughout the trial.

■ Finally, although the defendants allege that Rodriquez exercised his peremptory challenges in a way they would not have, they offer no facts that would support this allegation or show that "the jury as finally selected was other than representative and impartial."[8] This contention, therefore, does not warrant reversal.

### III.

Sandoval and Lucero assert that the evidence was insufficient to support their convictions. The standard of review is whether, viewing the evidence in the light most favorable to the government, a rational trier of fact could find the essential elements of the offenses beyond a reasonable doubt.[9] We must grant the government all reasonable inferences and all credibility choices.[10]

■ To convict on drug conspiracy charges under 21 U.S.C. §§ 846 and 841(a)(1), the government must prove that an agreement to violate the narcotics laws existed and the defendant knew of, intended to join, and participated in the conspiracy.[11] The government may meet its burden by circumstantial evidence, such as concert of action, and the defendant may be convicted even though he played only a minor role in the scheme and did not know all of its details.[12] To prove the charge of aiding and abetting under 18 U.S.C. § 2, the government must prove the defendant intended to aid the criminal activity and committed an act contributing to its execution.[13] The same evidence can be used to support both charges.[14]

■ For both offenses, the fact that a defendant is present at the crime or associates with the conspirators is evidence that he participated in the conspiracy or aided and abetted the criminal activity.[15] It is,

6. *United States v. Morrow*, 537 F.2d 120, 138 (5th Cir.1976); *United States v. Eastwood*, 489 F.2d 818, 822 (5th Cir.1973); *United States v. Pirolli*, 742 F.2d 1382, 1386 (11th Cir.1984).

7. 825 F.2d at 833 & n.2.

8. *United States v. Hooper*, 575 F.2d 496, 498 (5th Cir.), *cert. denied*, 439 U.S. 895, 99 S.Ct. 256, 58 L.Ed.2d 242 (1978).

9. *United States v. Santisteban*, 833 F.2d 513, 516 (5th Cir.1987) (*quoting Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

10. *Santisteban*, 833 F.2d at 516 (*citing United States v. Punch*, 722 F.2d 146 (5th Cir.1983)).

11. *United States v. Natel*, 812 F.2d 937, 940 (5th Cir.1987) (*citing United States v. Michelena-Orovio*, 719 F.2d 738, 742 (5th Cir.1983) (en banc)).

12. *Natel*, 812 F.2d at 940; *United States v. Vegara*, 687 F.2d 57, 60 (5th Cir.1982).

13. *United States v. Stovall*, 825 F.2d 817, 825 (5th Cir.1987).

14. *United States v. Magee*, 821 F.2d 234, 239 (5th Cir.1987).

15. *Natel*, 812 F.2d at 940 (*citing United States v. Trevino*, 560 F.2d 194, 197 (5th Cir.1977)).

however, not sufficient in itself, and we have not hesitated to reverse a conviction when the evidence has shown only that the defendant ran with bad company and has failed to support an inference that he knew of or participated in the conspiracy.[16]

■ The evidence was sufficient to convict Lucero. He twice met with Garcia privately on the day of the transaction, and after one of these meetings Garcia told Villarreal the "business" was arranged. The jury could credit Villarreal's testimony that he and Garcia "knew what we were coming [to Houston] for, for the drugs" and could reasonably infer that the meetings with Lucero in Houston concerned the drug deal. If, as Villarreal testified, the drugs were to arrive shortly after he and Garcia did, the only reasonable inference is that Lucero and Sandoval brought them. Although no one saw Lucero place the suitcase in the van, he had the opportunity to do so. Only Villarreal also had such an opportunity between the first and second times the agents checked the van; and the jury could credit his testimony that he carried no drugs and brought his suitcase up to the motel room rather than stashing it in the van. Finally, that Lucero had the van keys and gave them to Villarreal to toss to the agents supports an inference that he knew of and participated in the conspiracy.

■ The evidence against Sandoval is less, but it was marginally sufficient to support his conviction. Most of the evidence, it is true, simply showed that Sandoval had accompanied or chauffeured Lucero, not that he knew of the purpose of their travels or intended to further that purpose.[17] Sandoval, however, could hardly have failed to notice that Lucero had moved the suitcase from the Bronco to the van; and the jury could also reasonably infer that Sandoval heard Villarreal call out that the "stuff" was in the van. Sandoval did, moreover, show caution by declining to

return to the motel without speaking to Lucero directly by phone; and the agents found a loaded automatic pistol under the driver's seat. These facts and reasonable inferences from them, together with Sandoval's "presence and association," sufficed to allow the jury to conclude that he knew illicit activity was afoot and that he participated in it.

■ The pistol, the cellular telephone, and the hotel receipts were properly admitted, for the agents had probable cause to arrest Sandoval. Although an officer's bare "hunch" that a person has committed a crime does not constitute probable cause,[18] the hunch on which the agents originally proceeded was confirmed by later observations that justified the arrest. Sandoval's Bronco matched the one seen driving in and out of the motel parking lot, and we may reasonably infer that Sandoval himself matched the description of the Hispanic man whom the agents, based on the telephone call, were seeking.

## IV.

On the second day of deliberations, the jury sent a note asking the judge to "read ... Villarreal's testimony about the suitcase Villarreal had in the van that was taken upstairs to Room 229" and to "reread Villarreal's testimony regarding what Villarreal did after coming from Houston to the Holiday Inn." Garcia and Lucero asked that in reading the transcripts, the court exclude any testimony concerning conversations Villarreal had on the trip or after he arrived at the motel. The judge first agreed but eventually read to the jury testimony that included references to Garcia's statements to Villarreal, made during the trip back to the Holiday Inn, that the cocaine was not with them but was coming behind them. On this basis, Garcia and Lucero asked for a mistrial.

---

16. *United States v. Gardea Carrasco,* 830 F.2d 41 (5th Cir.1987); *United States v. Moreno–Hinojosa,* 804 F.2d 845 (5th Cir.1986); *United States v. Tolliver,* 780 F.2d 1177 (5th Cir.1986); *United States v. Gomez,* 776 F.2d 542 (5th Cir.1985).

17. *Compare Gomez,* 776 F.2d at 549; *Tolliver,* 780 F.2d at 1183.

18. *United States v. Chadwick,* 532 F.2d 773, 785 (1st Cir.1976), *aff'd on other grounds,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

 Again, however, this action, if it was error, does not require reversal. The trial judge has broad discretion in responding to a jury request to reread testimony.[19] Although the portion read may have gone somewhat beyond the precise scope of the jury's question, the court stated it believed testimony concerning the trip would help put Villarreal's arrival at the Holiday Inn "in context." Indeed, the testimony shows that Villarreal referred to the conversation with Garcia during the trip in order to explain a conversation he had with undercover agent Hernandez after he arrived at the Holiday Inn:

Q. Let me ask you again about when Hernandez opened the door and lifted up the blanket and he said where—whatever—what did he say?

A. He asked for the drugs, where.

Q. And who responded, if anyone?

A. I, sir.

Q. What did you say?

A. It is not here now.

Q. Did you say—what else did you say?

A. I said it will arrive later on.

Q. Now, how did you know it would arrive later on?

A. Because that was the understanding.

Q. Whose understanding?

A. That Napoleon Garcia had told me that he was coming.

Q. When did he tell you that?

A. When we were coming on our way.

Q. From the Quality Inn to the Holiday Inn?

A. Yes, sir.

Q. Exactly what did Napoleon tell you?

A. He said, here comes the drug behind us.

Q. Did he say who was coming behind you?

A. No, sir.

The testimony concerning conversations on the trip, therefore, was helpful to explain the conversation Villarreal had after arriving at the Holiday Inn, a subject clearly within the scope of the jury's request.

If there was any prejudice, moreover, it was cured by the court's immediate cautionary instruction that "[t]he testimony that has been read to you is not to be given any additional weight because of its being read after deliberations had begun." The district court did not abuse its discretion, therefore, in denying a mistrial.

For these reasons, we AFFIRM the convictions.

---

**19.** *United States v. Alfonso,* 552 F.2d 605, 619 (5th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977); *see also United States v. Alonzo,* 681 F.2d 997, 1003 (5th Cir. 1982), *cert. denied,* 459 U.S. 1021, 103 S.Ct. 386, 74 L.Ed.2d 517 (1983).