# United States Court of Appeals
# for the Fifth Circuit

———————

No. 21-50642

———————

United States Court of Appeals
Fifth Circuit

**FILED**
June 7, 2024

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

VICTOR MANUEL CAMPOS-AYALA;
MARTIN MONCADA-DE LA CRUZ,

*Defendants—Appellants*.

———————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 4:21-CR-38-2

———————————————————

Before RICHMAN, *Chief Judge*, JONES, SMITH, STEWART, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*, joined by JONES, STEWART, SOUTHWICK, HAYNES[*], HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, and RAMIREZ, *Circuit Judges*:

———————————

[*] Judge Haynes concurs in the judgment only.

No. 21-50642

Victor Campos-Ayala and Martin Moncada-De La Cruz were found guilty by a jury of possession with intent to distribute one hundred kilograms or more of marihuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). They appealed. Finding the evidence insufficient, a panel, over a dissent, reversed. 70 F.4th 261 (5th Cir. 2023). This court granted en banc rehearing, thus vacating the panel opinion. 81 F.4th 460 (5th Cir. 2023) (per curiam). Because the evidence is sufficient, and there is no other reversible error, we affirm the judgments of conviction.

I

The panel majority aptly recounted many of the salient facts. 70 F.4th at 264–65. We first set forth the facts that the panel relied on. Then we present, from the record, additional facts that must be considered in order for the en banc court to rule on all the issues.

The day after aliens Campos and Moncada crossed illegally from Mexico, they were given a ride for a considerable distance in a car that contained no contraband. Before reaching their destination, the driver dropped them off at a roadside park, promising to return. When he did so about thirty minutes later, the car was packed full of large bundles of marihuana. The defendants helped rearrange the bundles to provide room to ride in the crowded vehicle.

Troopers, who stopped the vehicle, discovered the passengers and the marihuana.  The panel dissent, 70 F.4th at 270 (Oldham, J., dissenting), included the following picture of the bundles, amounting to 283 pounds of marihuana:



In addition to the defendants, the occupants included the driver—a male juvenile—and another passenger with her child.

The juvenile driver was immediately taken away in handcuffs.  The defendants were questioned at the scene by Border Patrol agents, then taken to a station, where they were interrogated by DEA agents.  The panel majority helpfully set forth its recitation of the salient details:

> Agent Ramos asked Campos-Ayala and Moncada-De La Cruz, "Do you know what you're on?"  One of them responded, "uh" or "no."  Agent Ramos asked, "the weed, right" or "that's marijuana," to which one of them nodded in the affirmative and the other state[d], "yes."
>
> Campos-Ayala and Moncada-De La Cruz were removed from the vehicle shortly after.  While frisking Campos-Ayala, Agent Ramos asked, "Why did you help with the drugs?"

Campos-Ayala responded, "I didn't." While escorting Campos-Ayala to the transport van, Agent Ramos asked, "Why did you cross with the drugs?" Campos-Ayala responded, "I didn't, I just helped."

Campos-Ayala, Moncada-De La Cruz, and another passenger in the vehicle were transported to a station with agents from the Drug Enforcement Administration (DEA). At the station, all three gave the same basic story.

The passengers were strangers but crossed the border together and flagged down a random car in hopes of travelling further into the United States. There were no drugs in the vehicle when they first accepted the ride. After they had been on the road for some time, the driver dropped the passengers off at a roadside park and told the passengers he would come back for them. When the driver returned, the car was loaded with the large bundles of marihuana.

Agents Kettani and Bustamante testified that Moncada-De La Cruz said "he helped rearrange [the bundles of marihuana] so that everybody could fit inside the vehicle, because it's a small vehicle." Agent Bustamante elaborated that the agents believed, in doing so, Moncada-De La Cruz "was possessing the marijuana inside the vehicle."

DEA Agent Kettani testified that Campos-Ayala "ma[de] a statement that he would understand what his charge was," stating, "He understood why he had been arrested. And in Spanish he said . . . Well, I guess that's how it goes. Yes, I was in possession of the marijuana." Agent Bustamante confirmed that Agent Kettani was asking Campos-Ayala if he "understood why he was being arrested," and "what charges [were] being pressed against him," to which Campos-Ayala responded in Spanish slang, "That's just the way things are and I was in possession of the marijuana." Bustamante also testified that Campos-Ayala said, "I guess that's just the way things happen," and that "he understood that he was in possession of the marijuana."

No. 21-50642

*Id.* at 264–65 (some paragraph breaks inserted; alterations in original).

## II

The matter proceeded to trial. Both defendants moved for acquittal at the close of the government's case; neither renewed that motion at the close of all the evidence. After three hours of deliberation, the jury found both defendants guilty, and they appealed.[1]

On appeal, the appellants raise three issues. First, both question the sufficiency of the evidence. Second, both claim the government removed, to Mexico, a witness who had material evidence favorable to the defendants. Third, they assert a *Miranda* violation during the questioning by law enforcement. Because the panel majority decided the evidence was insufficient, it saw no need to consider the other two issues. We will address all three in turn.

## III
### A

To convict under 21 U.S.C. § 841(a)(1) and (b)(1)(B)—possession of a controlled substance with intent to distribute—the government must prove "(1) knowledge, (2) possession, and (3) intent to distribute." *United States v. Lopez-Monzon*, 850 F.3d 202, 206 (5th Cir. 2017) (citation omitted). The panel aptly set forth the governing standards, 70 F.4th at 266: Possession "may be actual or constructive." *United States v. McCowan*, 469 F.3d 386, 390 (5th Cir. 2006) (citation omitted). A defendant has actual possession if he "knowingly has direct physical control over a thing." *United States v. Meza*, 701 F.3d 411, 419 (5th Cir. 2012) (citation omitted). A person has

---

[1] Both were sentenced to the mandatory minimum of 60 months, plus 5 years' supervised release and a $100 assessment.

constructive possession by "(1) ownership, dominion or control over the item itself or (2) dominion or control over the premises." *Id.* "[T]he government must establish [an] adequate nexus between the accused and the prohibited substance." *United States v. Benbrook*, 40 F.3d 88, 94 (5th Cir. 1994). "Mere presence in the area where drugs are found is insufficient to support a finding of possession." *United States v. Cordova-Larios*, 907 F.2d 40, 42 (5th Cir. 1990). The evidence of possession is insufficient where it "has shown only that the defendant ran with bad company." *United States v. Sandoval*, 847 F.2d 179, 185 (5th Cir. 1988). The determination of constructive possession "employ[s] a common sense, fact-specific approach." *Meza*, 701 F.3d at 419 (citation omitted).

B

Campos introduced no evidence, so he was not required to renew his motion for a directed acquittal. That means we review his sufficiency challenge *de novo*, considering the evidence and all reasonable inferences in the light most favorable to the verdict, to determine whether any rational jury could have found the essential elements beyond a reasonable doubt. *United States v. Delgado*, 984 F.3d 435, 446 (5th Cir. 2021).

Because Moncada did call a witness before failing to renew his motion for acquittal, we review his sufficiency issue under a more demanding standard: To prevail on appeal, he must show that the record is "devoid of evidence pointing to guilt or if the evidence is so tenuous that a conviction is shocking." *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) (en banc) (cleaned up).

C

The panel majority summarized, as follows, its finding of insufficient evidence:

Based on the available evidence, the jury could not reason-

ably conclude Campos-Ayala or Moncada-De La Cruz possessed the marihuana with the intent to distribute it. Moncada-De La Cruz's statement that he rearranged the bundles, while showing more than mere presence, does not establish an adequate nexus sufficient to enable a reasonable jury to find possession. Campos-Ayala's statements that he "just helped" and "understood" he was in possession after Agent Kettani explained the charges to him are similarly insufficient for a reasonable jury to find he possessed the marijuana.

70 F.4th at 266–67 (footnote omitted).

By so reasoning, the panel confined its factual observations to the actions of the defendants—who were the two male passengers—inside and immediately outside the car crammed with marihuana. But that is not all the pertinent evidence that the jury heard that well could have influenced its verdict and could explain how that verdict was reached.

That additional evidence centers on two groups of facts that were presented at trial. First, we need to consider the involvement of a female passenger who was not charged. Second, a fair evaluation of sufficiency requires consideration of all the facts leading up to the defendants' getting into the subject vehicle in the first place.

1

First, there is the person whom the panel majority referred to only cursorily as "another passenger in the vehicle." 70 F.4th at 264. She is Karina Castro-Hernandez, an adult female who crossed the border with the defendants, accompanied by her six-year-old daughter. The defendants aver that Castro could have given testimony favorable to them and that the government wrongly removed her from the U.S., thus making her unavailable.[2]

---

[2] This is an issue on appeal that we will discuss separately and in more detail, *infra*.

2

Second, there is additional evidence, heard by the jury, that undercuts the defendants' claim that they were only hitchhikers who innocently flagged a ride with what the panel majority called a "random" stranger and benignly became involved with a driver who was transporting contraband with intent to distribute. That additional evidence, heard by the jury, involves, *inter alia*, a mysterious phone call and the fact that one defendant possessed not one phone, but two.

In his opening panel brief, filed over two years ago, Campos skirted the details by stating only the following, in regard to the initial encounter with the transporting vehicle:

> [The defendants] crossed illegally . . . into Presidio, Texas . . . accompanied by [Castro and her daughter]. All four of them hoped to travel to Odessa, Texas. They spent the evening hiding under a bridge near the border. The next day, they flagged down a car driven by seventeen-year-old Jose Ramos. Ramos picked them up and drove them to Van Horn, Texas.

Moncada gave a similar account in his opening panel brief, referring to the travelers' "good fortune of catching a ride with the young man" by "the flagging down of the car." "[T]hey only sought to journey into the United States and took the ride they could find."

But Campos's account of the initial pickup at the bridge has radically and diametrically changed once we agreed to hear the case en banc. Campos's supplemental en banc reply brief, filed about a month before en banc oral argument, admitted that the initial encounter with the car driven by Ramos was anything but random:

> The evidence, however, did not suggest that Hernan-

dez's[3] picking up of Campos, Moncada, Castro, and Castro's daughter occurred by chance. According to [Agent] Kettani, Castro said:

> [T]hey crossed through Ojinaga, OJ, Mexico into Presidio. She said that she really didn't know the other two defendants that they crossed with. They crossed in the evening. When they went to Presidio, it was during the evening. They spent the night there in a ditch under the bridge. She wasn't really sure. She said it was outdoors. She stated that the phone rang in the morning, and they were trying to look for a ride. They flagged down an individual and that's when the driver went to pick them up.

ROA.651–52.

> . . . .

> What happened is clear. The smugglers with whom Castro, Campos, and Moncada had coordinated either gave them a phone or took their number to relay it to Hernandez. He called that number in the morning. ROA.651–52. Believing him nearby, they waved [*sic*] at the car nearest them, and he picked them up. ROA.651–52. This is a common alien-smuggling strategy. *See, e.g.*, *United States v. Cardenas-Menses*, 532 F. App'x 505 (5th Cir. 2013) ("'[W]alkers guided aliens across the Rio Grande River into the brush and the aliens were then picked up by a driver and brought to a stash house. On the night of August 9, 2004, [a conspirator] drove the vehicle to the pre-designated pick-up spot, honked his horn, and a large number of aliens rushed to the car and got in.")

Regarding this story of collusion between the defendants and the driver, Campos's supplemental brief concluded, "The jury could not have reasonably disbelieved the accounts of Moncada, Campos, and Castro because they

---

[3] The teenage driver's full name is Jose Ramos-Hernandez.

were sponsored by the government and corroborated by the investigation."

And on the subject of telephones, there is other critical evidence: Campos was found to have two phones. At trial, Border Patrol Agent Ramos was asked, "Isn't it really common for a lot of people who live in border areas or who even cross the border to have two phones, one that works in Mexico and one that works in America?" He answered, "No, ma'am. Actually, it's common for them to have satellite phones because there is no mobile reception along the border." And further, when asked "is it suspicious when someone has two phones?," Ramos replied, "When it's a government employee or somebody that works professionally, no. When it's an individual that's coming from the border, yes, sir."

The upshot of this is that the jury heard it and could reasonably draw the inference that the defendants were neither innocent tourists on Christmas Eve nor just naïve victims of happenstance, but, instead and to the contrary, were part of a larger scheme. Here is the government's theory, set forth in its supplemental en banc brief:

> A perceptive jury could reasonably question the credibility of their common account: there was a phone call, they "flagged down" a ride from Presidio to Odessa; Campos possessed two phones; and they were unsuspecting victims of Hernandez's manipulations, which put them to the difficult choice of helping transport the marijuana load or staying in the roadside park. When it became obvious that Hernandez had two missions—transporting non-citizens and marijuana—they could have abandoned Hernandez and the contraband and attempted to ca[tch] another ride on IH-10. Instead, they reloaded the car and climbed in with Hernandez and the marijuana. When the illegal enterprise (illegal entry and transportation) expanded in scope (transporting bulk marijuana), they elected to join it. At the very least, they committed the marijuana offense to accom-

plish their own unlawful conduct.

In its closing argument to the jury, the government carefully raised doubt as to the defendants' "innocent" conduct. The jury was free to consider that possibility in light of all the evidence. The government argued to the jury, *inter alia*, as follows:

> So let's talk about this story. They want you to believe that they walked into the country with a female and her daughter and saw someone that they have never met and said, Hey, can I have a ride?
>
> Sure. I've never met you. Oh, and you have a female and her daughter? That's not suspicious. Hop in. I'll take you to a park.
>
> And so they go to a park and they drop them off at a random park. This kid leaves and half an hour later he comes back. These grown men are putting the blame on a 17-year-old boy. Do you believe that that 17-year-old boy loaded up 128 kilograms by himself in 30 minutes?

## D

Having now brought into play this additional evidence that the panel did not mention, we address the overriding question of sufficiency. The jury was properly instructed in accordance with the applicable pattern jury instructions and well-settled Fifth Circuit law, particularly our circuit's mere-presence instruction. No party challenged any of those instructions at trial or on appeal.[4]

The court charged, ROA.725–727, as follows:

---

[4] "A district court does not err by giving a charge that tracks this court's pattern instructions and is a correct statement of the law." *United States v. Knight*, No. 23-30569, 2024 U.S. App. LEXIS 5179, at *3–4 (5th Cir. Mar. 4, 2024) (per curiam) (unpublished) (citing *United States v. Whitfield*, 590 F.3d 325, 354 (5th Cir. 2009)).

No. 21-50642

To "possess with intent to distribute" simply means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

Intent to distribute may be inferred from possession of an amount of controlled substance that is too large to be used by the possessor alone. But a quantity that is consistent with personal use does not raise such an inference in the absence of other evidence.

Mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted in the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

"Possession," as that term is used in the instructions, may be one of two kinds: actual possession or constructive possession.

A person who knowingly has direct physical control over a thing, at a given time, is in actual possession of it.

A person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is in constructive possession of it.

Possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

. . . .

The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

No. 21-50642

> It is reasonable to infer that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any intentional act or conscious omission. Any such inference drawn is entitled to be considered by the jury in determining whether or not the government has proved beyond a reasonable doubt that the defendant possessed the required criminal intent.

The jury answered, in the affirmative, the questions (1) whether the defendants were guilty of possession with intent to distribute and (2) whether the amount was 100 kilograms or more.

E

There is ample evidence from which the jury could find possession with intent to distribute. The second part is easier: Once the jury finds possession, and further finds an amount above the statutory threshold, it can (but is not required to) draw the inference of intent to distribute. This rule of law—that possession of large enough quantities is sufficient, by itself, to prove intent to distribute—is so embedded in Fifth Circuit precedent as to be beyond cavil.[5]

---

[5] *See, e.g.*, *United States v. Williamson*, 533 F.3d 269, 277–78 (5th Cir. 2008) ("We have held in the past that the *mere possession* of a quantity of drugs inconsistent with personal use will *suffice* for the jury to find intent to distribute." (emphasis added) (citation omitted); *United States v. Mays*, 466 F.3d 335, 341 (5th Cir. 2006) (same); *United States v. Anguiano*, 27 F.4th 1070, 1073 (5th Cir. 2022) (similar); *see also United States v. Hunt*, 129 F.3d 739, 742 (5th Cir. 1997) ("*Intent to distribute may be inferred solely* from the possession of an amount of controlled substance too large to be used by the possessor alone." (emphasis added)); *United States v. Prieto-Tejas*, 779 F.2d 1098, 1101 (5th Cir. 1986) (same); *United States v. Grayson*, 625 F.2d 66, 66 (5th Cir. 1980) (same).

No. 21-50642

The government repeatedly argued that this case is all about possession, and that is so.  And that is the reason we have juries.

Much is made of whether the process of rearranging the bundles in the car, to allow room for the passengers to occupy that vehicle, qualified as "possession" as the court carefully instructed the jury.  It was for the twelve jurors to consider all the evidence and to decide the nature of the defendants' encounter with the driver.  A jury is entitled to give whatever weight it wishes to any part of the evidence and to draw, or not draw, the inferences that the law allows.

In examining sufficiency, we must view the evidence in the light most favorable to the verdict.  In that regard, the jury was entitled to give any amount of weight or credence *vel non* to, *inter alia*, any or all of, or any combination of, the following, any one of which is enough to establish sufficiency of the evidence:

• That the defendants voluntarily surrounded themselves with what was admittedly a controlled substance.

• That they repeatedly handled and rearranged the contraband.

• That, knowing that this was obviously a distribution scheme, they made no effort to exit the car or thwart the enterprise.

• The substantial possibility that the initial encounter with the driver was pre-arranged as part of some sort of illegal enterprise.

• The suspicious phone call under the bridge, conveniently followed by the arrival of a friendly driver offering a ride.

• Campos's possession of two phones.

• The lack of an explanation of how it was possible for the teenage driver to load five large bundles of marijuana, weighing about 280 pounds,

14

into the cramped space of a small vehicle, all by himself, in about 30 minutes including travel time (raising the natural inference that, instead, the defendants were recruited, from the very beginning, to assist in loading, arranging, and unloading the contraband).

• Whether it was plausible for the defendants to believe that Ramos-Hernandez was going to transport them well over 200 miles, for free, for several hours, to their chosen destination of Odessa and to do so on Christmas Eve.

• The fact that the trip from Presidio to Van Horn was way out of the way of the defendants' supposed destination, which would have been a trip from Presidio to Odessa.

• Whether, in accordance with the government's hypothesis, this was all part of a consolidated scheme involving alien smuggling and marihuana distribution, using the defendants as handy workers to lift, pack, and unpack heavy bales of marihuana.

• That the defendants were seemingly not the least bit worried when Ramos-Hernandez suddenly disappeared, apparently without explanation, thus abandoning them at the roadside park, on the mere promise to return later.

• Perhaps most importantly, Campos's admissions that he "possessed" and "helped with" the marihuana and of course knew it was marihuana.

Campos's en banc reply brief, referred to above, unwittingly summarizes the likelihood that the defendants willingly engaged in a multifaceted unlawful enterprise: "Campos accepted a ride with Hernandez, someone who, having agreed to smuggle him, decided to double dip and attempt to profit further by smuggling marijuana at the same time." At the very least,

the jury was easily entitled (but not required) to draw the inference that these defendants unwisely cooperated in an operation that included alien-smuggling and marihuana possession and distribution.

It is not the proper role of this court, sitting in what some might call an ivory tower with a bunch of briefs and a dry record, to second-guess a jury that heard evidence for two days and spent three hours poring over it. These defendants

> fall below the high standard required to reverse [the] verdict because, at the very best, there might be questions about how [the jury] weighed the evidence. That is far from demonstrating that the verdict is against the great weight of the evidence, especially when drawing all reasonable inferences in its favor and without substituting inferences that we might regard as more reasonable.

*Smith v. DG La., L.L.C.*, No. 23-30261, 2024 U.S. App. LEXIS 5792, at *9–10 (5th Cir. Mar. 11, 2024) (per curiam) (unpublished) (cleaned up).

The twelve jurors were reasonably entitled to consider all the evidence and to render a verdict of guilty. Under the applicable standards of review, the evidence amply supports that result.

IV

We turn to the defendants' claim that Karina Castro-Hernandez could have given testimony favorable to them and that the government wrongly removed her, making her unavailable as a witness.[6] Moncada contends that, by failing to dismiss the indictment on this ground, the district court violated his rights to due process and compulsory process to obtain a witness for his

---

[6] Given its decision that the evidence was insufficient, the panel, understandably, did not address this issue, though it was preserved and properly raised on appeal.

defense.[7]  The government responds that the defendants have not clearly shown that that Castro's testimony would have been available and that, even if available, it would have been cumulative of the agents' testimony regarding their interview with Castro and was not likely to have produced a different verdict.

We review *de novo* any alleged violation of due process or compulsory process.  *United States v. Piper*, 912 F.3d 847, 853 (5th Cir. 2019) (per curiam); *United States v. Tuma*, 738 F.3d 681, 688 (5th Cir. 2013).

A

At a hearing on the motion to dismiss, defense counsel stated, as facts, that Castro, in an interview with DEA Agent Kettani, told "a story that matched our defendants' [*sic*] stories in substance":  The driver picked up the defendants, Castro, and her daughter, then left them at a park for 30–40 minutes and returned with the bundles of marihuana in the car.  The lawyer stated, "There is some conversation about whether or not the driver told them that there were clothing in the bundles, and they were all instructed to get back in the vehicle.  They crammed their way back in as best they could, and they were arrested 19 miles later . . . ."

Moncada's attorney represented that Castro would "testify that neither she nor [defendants] had anything to do with bringing in the marihuana or possessing the marihuana . . . .  They were coming in illegally to get to points where they wanted to be."  Importantly, counsel said that the government knew about the allegedly favorable interview and failed to disclose its existence before the authorities removed Castro.  The government disagrees, noting that its affidavit accompanying the criminal complaint alerted

---

[7] Campos adopts this argument.

defense counsel to the interview and removal. Two days later, Moncada's lawyer questioned Kettani about any relationship between Castro and the defendants but failed to ask about the interviews. Campos's attorney asked Kettani whether Castro had been interviewed but did not inquire as to what Castro had said in the interview.

The crux of the defendants' theory is that Castro was the only available witness to what happened the day of the incident because the seventeen-year-old driver invoked his Fifth Amendment privilege and the defendants declined to testify. Counsel explained that they explored obtaining a permit to allow Castro to re-enter the United States or, in the alternative, trying to depose her. Castro did send them a video statement but refused to return to the U.S., fearing arrest.[8]

The government assured the district court that (1) Castro's account would be presented through the agents' testimony, (2) her statements would be cumulative, and (3) her absence would not be prejudicial to the defendants. Crucially, the government averred that the removal was not in bad faith but resulted from the fact that there were no beds available to keep the mother and young daughter together. Charging Castro would have separated them. In regard to having enough evidence to convict her, the government believed that a jury could see that she could not have lifted or carried the large bundles of marihuana.

The district court found that there was no bad faith and that, instead, the government had a particular interest in deporting Castro as soon as possible because this was in the middle of the COVID pandemic (December

---

[8] Defense counsel never offered the video to show what Castro would have said as a witness after counsel acknowledged that there were "admissibility issues" with the video statement.

2020).  So she was referred for expedited removal.

Agents Kettani and Bustamante testified in detail as to both the interview with Castro and the defendants' statements to law enforcement.  It turns out that Castro's and both defendants' statements were, for all practical and legal purposes, identical.[9]  The government did not dispute or object to the account of Castro's or the defendants' statements, on which defendants relied in further proceedings.

## B

The right to compulsory process is surely implicated where the government removes an alien before defense counsel has had a chance to interview that person.[10]  We balance that right against the government's responsibility faithfully to execute the immigration laws requiring prompt and efficient removal.  *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864–65 (1982).

To succeed on this claim, the defendants must "make[ ] a plausible showing that the testimony of the deported witness[ ] would have been material and favorable . . . , in ways not merely cumulative."  *Id.* at 873.  A defendant "must show prejudice."  *Gonzales*, 436 F.3d at 578.  Dismissal should be granted "only if there is a reasonable likelihood that the testimony could have affected the judgment of [the jury]."  *Valenzuela-Bernal*, 458 U.S. at 873–74.

The testimony of removed aliens is merely cumulative where other persons have imparted the same information.  *United States v. Perez*, 217 F.3d

---

[9] The only difference is that Castro did not describe how the passengers got back into the vehicle with the bundles of marihuana.

[10] *United States v. Gonzales*, 436 F.3d 560, 577 (5th Cir. 2006), *overruled on other grounds by United States v. Vargas-Ocampo*, 747 F.3d 299, 300–02 (5th Cir. 2014) (en banc).

323, 327 (5th Cir. 2000).  As we have pointed out, the agents described Castro's story in detail.  Nothing in her reported statements contradicted the defendants' admissions regarding (1) their knowledge of the presence of marihuana or (2) their rearranging the bundles in the car.  Instead, Castro reinforced the defendants' acknowledgements that they re-entered the vehicle knowing it was packed tight with marihuana.

In sum, there is no reasonable likelihood that the jury would have reached a different verdict just because Castro had testified in person.

## C

Nor did the government act in bad faith by deporting Castro before disclosing the statement she had made to the agents.[11]  In an unrealistically perfect world, all witnesses would be easily and immediately available for every trial.  Here, given competing considerations, the government struck a proper balance.

On the one hand, these defendants have the basic right to compulsory process.  On the other hand, as we have said, the government has a core responsibility for faithful execution of the many immigration laws.  Consistently with that responsibility, the government was faced with the COVID crisis, the lack of available detention space, and the humanitarian responsibility to keep together a mother traveling alone with a six-year-old child.

The district court correctly determined that the admission, without objection, of Castro's hearsay statements adequately protected these defendants' rights.  The indictment should not have been—and was not—dismissed on account of Castro's unavailability as a witness.

---

[11] Unlike some other circuits, this court has not adopted a requirement of bad faith for a defendant to succeed in complaining of the removal of a witness. *See, e.g.*, *Gonzales*, 436 F.3d at 579.  The district court, nonetheless, helpfully found that there was no bad faith.

V

The district court denied defendants' motion to suppress statements they made to Border Patrol Agent Ramos after the car was stopped on the highway.[12] In essence, they averred that they had been in custody while waiting for some agents to arrive, and Ramos questioned them without *Miranda* warnings.[13] We review factual findings for clear error and conclusions of law *de novo*. *United States v. Lim*, 897 F.3d 673, 685 (5th Cir. 2018).

Trooper Foster testified that 20 to 30 minutes elapsed between the stop of the vehicle and the arrival of the first Border Patrol agent. The government acknowledges that in that interval, no one was taken from the car, nor was anyone free to leave. After BP agents arrived, they first removed Castro and her daughter from the car. Minutes later, Agent Ramos conversed with the defendants, who were still in the car but could see Ramos.

Ramos, in his words, "asked them in Spanish . . . 'Do you know what you're on?' . . . And I said, (speaking Spanish.) 'The weed,' right. And then one of them said, 'Yes.' . . . And then the other one just nodded his head yes (speaking Spanish.)."

An agent removed Moncada from the vehicle and searched him. Ramos asked Campos (still in the car) whether he had anything dangerous. Then while frisking Campos, Ramos asked why he helped with the drugs; Campos said he did not. Ramos asked, "No?," and Campos replied, "No." Ramos asked in Spanish, "So, why did you cross with the drugs?" Campos answered, "I didn't. I just helped." Ramos retorted, "Exactly." Campos

---

[12] Just as with the issue regarding Castro, the panel properly determined that it need not decide this issue.

[13] *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). The district court addressed this motion, after jury selection, and heard testimony from Ramos and Trooper Foster.

was not in handcuffs.

The district court denied suppression. It found that taking 40 minutes for agents to arrive at the remote location and secure the scene was not an undue delay. The court further found that Ramos's questioning was not formal but "more in a rapid, almost contemporaneous manner which he came up on this vehicle and started—and sort of asking a few questions." Importantly, the court found that this was not a custodial setting under *Miranda*.

The court reasoned further that Campos was not handcuffed and that neither defendant was free to leave, there was reasonable suspicion, and, in the district court's words, "they were being detained much like an ordinary traffic stop would happen. So no formal arrest was made at the time. They were never really arrested until they were taken to the transport vehicle."

"*Miranda* warnings must be administered prior to 'custodial interrogation.'" *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc) (citation omitted). A person is "in custody" under *Miranda* "when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* at 596. In evaluating the "in custody" requirement, this court has taken account of (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory or non-accusatory nature of the questioning; (4) the amount of restraint on the person's movement; and (5) any statements by the officers concerning the individual's freedom to move or leave.[14] Applying these factors, the district court did not err in its findings or

---

[14] *United States v. Ortiz*, 781 F.3d 221, 229–30 (5th Cir. 2015); *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015); *United States v. Gonzalez*, 814 F. App'x 838, 842 (5th Cir. 2020) (per curiam).

conclusions.

More specifically: The initial command to remain in the car was a routine detention to investigate whether there was a crime, not custody or a formal arrest. *See United States v. Reyes*, 963 F.3d 482, 490 (5th Cir. 2020). And generally, *Miranda* warnings are not required when officers question occupants during a routine traffic stop. Bodycam video indicates that Agent Ramos was calm and respectful instead of threatening. Further, Campos was not placed into a patrol car, handcuffed, or removed from the scene before Ramos's questioning.

Questions about the presence of guns or drugs, in the early phase of a traffic stop, do not necessarily amount to custodial restraint. *See United States v. Coulter*, 41 F.4th 451, 459–60 (5th Cir. 2022). The inquiry as to Campos's involvement with the marihuana was reasonably designed to ascertain whether the agents were dealing only with aliens or, instead, with a more serious situation posing a greater immediate risk.

Despite the fact that, as the district court stated, Campos was not free to leave, he was not—as a matter of law—in custody. It would have been unrealistic for him to think that he could leave the scene, but that was because he was a passenger in a car driven by a stranger; he was stopped in a remote, unfamiliar location; and he could not drive himself away or reasonably depart on foot. The roadside questioning before Campos was placed into the transport van did not subject him to the type of police interrogation that we have described as coercive.

The district court did not err in denying the joint motion to suppress.

\* \* \* \* \*

In summary: The evidence was sufficient, and the well-conducted trial was free of error. The judgments of conviction are AFFIRMED.

No. 21-50642

Priscilla Richman, *Chief Judge*, joined by Elrod, Graves, and Douglas, *Circuit Judges*, dissenting:

Our criminal justice system ensures that no person suffers the burden of a criminal conviction unless the government adheres to well-established procedural safeguards. We require the government to inform the accused of their constitutional rights—in the form of *Miranda* warnings—before custodial interrogation.[1] The government cannot deny the accused meaningful access to the only available witness with personal knowledge of material, non-cumulative facts favorable to the defense even if that witness is an illegal immigrant who would otherwise be subject to expedited removal.[2] At trial, the government must offer sufficient evidence to establish every element of a criminal offense beyond a reasonable doubt.[3] These protections are fundamental to our understanding of due process. They safeguard every person from the arbitrary action of government and ensure that the government has borne its burden of proving a defendant's guilt before depriving them of their liberty.

Allowing the convictions in this case to stand fails to effectuate these safeguards in three critical respects. First, there is legally insufficient evidence that the defendants possessed marihuana with the intent to distribute it. Possession with intent to distribute cannot be inferred or presumed when the prosecution's own evidence disproves intent to distribute. The government did not meet its burden of proof. Second, the district court admitted into evidence statements made by criminal defendants after they were restrained for forty minutes, surrounded by six officers, and

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[2] *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867-68 (1982).

[3] *Jackson v. Virginia*, 443 U.S. 307, 316-19 (1979).

interrogated without receiving warnings consistent with *Miranda v. Arizona*.[4] Third, those same criminal defendants could not mount an effective defense because the government deported the sole available witness with first-hand knowledge of what transpired from the time the defendants illegally entered this country until they were arrested. The government deported the witness before providing the defendants the proper notice, meaning the defendants could not even depose her. Her testimony would have been material and helpful. It would have corroborated how the defendants came to be crammed into the vehicle on top of the marihuana. Nevertheless, the district court concluded that hearsay testimony from arresting officers was adequate to convey what this witness had told them, and the majority opinion agrees, even though that conclusion finds no support in the law, and even though during closing argument, the government told the jury it should not believe the absent witness's statements recounted by arresting officers. The majority opinion goes further, spinning scenarios of what might have transpired based on nothing more than conjecture. The arresting officers did not so much as hint that the statements the deported witness made to them were false or lacked credibility. But most importantly, the jury had no opportunity to see and hear the deported witness to judge her credibility. I respectfully dissent.

# I

Undisputed details deserve attention. The government did not present witness testimony or any other evidence to contradict the following.

---

[4] 384 U.S. 436 (1966).

No. 21-50642

## A

Victor Campos-Ayala and Martin Moncada-De La Cruz illegally entered the United States through the southern border.[5]  The two men crossed the border with Karina Castro-Hernandez and her six-year-old daughter, who otherwise were unaffiliated with the two men.[6]  Many of the following facts were recounted by Castro-Hernandez when she was later interviewed by a federal agent.  There is no evidence that the group transported marihuana across the border.[7]

After entering the United States, the group hid under a bridge near Presidio, Texas.[8]  The next day, one of the men received a phone call, and the group began looking for a car to travel further into the United States.[9]  They successfully flagged down a driver and started their journey to Odessa, Texas.[10]  There is no evidence that drugs were inside the vehicle when the group entered the vehicle.[11]

During their journey, the driver—a seventeen-year-old juvenile— stopped in Van Horn, Texas and dropped the passengers off at a roadside park.[12]  He left the passengers in the park for thirty to forty minutes.[13]  When

---

[5] ROA.641-52.

[6] ROA.651.

[7] ROA.652; ROA.515 (Agent Ramos testifying that Campos-Ayala stated he did not cross with drugs).

[8] ROA.652.

[9] ROA.652.

[10] ROA.652.

[11] ROA.652.

[12] ROA.652.

[13] ROA.652.

he returned, the vehicle contained five large bundles of marihuana, weighing a total of approximately 283 pounds.[14]

The passengers rearranged the marihuana to fit in the compact car.[15] Castro-Hernandez sat in the front passenger's seat with a large bundle of marihuana in her lap.[16] Her six-year-old daughter sat to her left, straddling the console of the car.[17] Moncada-De La Cruz was curled in a fetal position behind the driver's seat, atop another large bundle of marihuana.[18] Campos-Ayala was prone, on his side, atop one bundle, jammed against another, and with his legs hanging over the back seat resting on a third bundle of marihuana.[19]

As the driver and his passengers continued to Odessa, a concerned citizen called the authorities regarding a compact car filled with people and rectangular bundles.[20] Troopers with the Texas Department of Public Safety pulled over the vehicle and immediately removed the driver from the car, handcuffed him, and seated him alongside the highway as they waited for U.S. Border Patrol.[21] The troopers instructed the passengers to remain in the vehicle.[22] Specifically, Trooper Foster testified that all occupants were told to "stay inside the car" and that he did not allow them to exit the

---

[14] ROA.636-37; ROA.652-55.

[15] ROA.615-16.

[16] ROA.365.

[17] ROA.430.

[18] ROA.366-67.

[19] ROA.366-67.

[20] ROA.14; ROA.441-42.

[21] ROA.429-30.

[22] ROA.390.

vehicle.[23] While waiting for Border Patrol, Trooper Foster stated on multiple occasions: "I never read people their rights because I don't talk to them" and "I don't got no reason to read [the passengers] their rights. I ain't talking to them."[24] It is undisputed that the state troopers did not give the passengers *Miranda* warnings.

Approximately thirty minutes later, the first Border Patrol agent arrived and immediately asked: "Did you guys *Miranda* [the driver] yet?"[25] Trooper Foster responded: "Nope, I ain't even ask him no questions."[26] Five minutes later, two more Border Patrol agents arrived on the scene. At this point, six uniformed officers surrounded the vehicle.[27] The agents removed Castro-Hernandez and her daughter from the passenger's seat and loaded them into a Border Patrol transport van.[28] The agents then approached the vehicle and questioned Campos-Ayala and Moncada-De La Cruz. Agent Daniel Walters asked where they were coming from and whether they were citizens of the United States.[29] Agent Eric Ramos then asked if the men "knew what they were on."[30] The agent testified that one defendant shrugged and the other said no.[31] Agent Ramos then questioned

---

[23] ROA.390.

[24] Foster Bodycam at 17:09-17:25, 18:21-18:37.

[25] Foster Bodycam at 27:07.

[26] Foster Bodycam at 27:09.

[27] ROA.371; Foster Bodycam at 31:55-34:00.

[28] ROA.508-09.

[29] ROA.487.

[30] ROA.509, 511.

[31] ROA.509, 511.

the men more specifically: "That's marijuana?"[32] Campos-Ayala said yes, and Moncada-De La Cruz nodded in agreement.[33] It is undisputed that the Border Patrol agents did not give the men *Miranda* warnings before questioning them about the drugs.[34]

Next, Agent Estevan Arteaga removed Moncada-De La Cruz from the vehicle and frisked him.[35] He then put Moncada-De La Cruz in the transport van.[36] Agent Ramos next removed Campos-Ayala, and while frisking him at the back of the car asked, "Why did you help with the drugs?"[37] Campos-Ayala replied that he did not.[38] Ramos then found two phones on Campos-Ayala and asked, "Why do you need two phones? . . .You have a lot of people that you have to call for the drugs?"[39] Campos-Ayala said no.[40] Then, as he walked Campos-Ayala to the transport van, Ramos asked, "Why did you cross with the drugs?"[41] Campos-Ayala replied, "I didn't cross. I just helped."[42] DEA Agent Javier Bustamante later testified that he understood one of the defendants to say during interrogation that the defendant "helped rearrange [the bundles] so that everybody could fit inside the vehicle."[43] It

---

[32] ROA.509

[33] ROA.509, 512.

[34] ROA.375.

[35] ROA.513-14.

[36] Foster Bodycam at 37:24-37:31.

[37] ROA.514.

[38] ROA.514.

[39] ROA.515.

[40] ROA.515.

[41] ROA.515.

[42] ROA.515.

[43] ROA.615-16.

No. 21-50642

is undisputed that Agent Ramos did not give Campos-Ayala *Miranda* warnings.[44]

## B

Campos-Ayala and Moncada-De La Cruz were indicted for possession with intent to distribute more than 100 kilograms of marihuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).[45]  The prosecution declined to charge Castro-Hernandez to avoid separating the mother from her daughter.[46]  Instead, federal agents interviewed the mother, who corroborated the defendants' account of how they came to be in the vehicle with the marihuana.[47]  Castro-Hernandez was then processed for expedited removal to Mexico.[48]  Jose Ramos-Hernandez, the juvenile driver, invoked his Fifth Amendment rights, made no statements, and prosecutors decided not to pursue charges against him.[49]

Campos-Ayala and Moncada-De La Cruz both pleaded not guilty and requested a trial.[50]  Both defendants sought to suppress the statements they made to Agent Ramos.[51]  The defendants also filed motions to dismiss due to

---

[44] ROA.375 (Agent Ramos testified "I didn't Mirandize those gentlemen because I wasn't interrogating them").

[45] ROA.918.

[46] ROA.502.

[47] ROA.651-53.

[48] ROA.500.

[49] ROA.501-03.

[50] ROA.26; ROA.922.

[51] ROA.356-61; ROA.111-13.

the improper removal of Castro-Hernandez, who could have served as a favorable witness.[52]

The district court denied the motions to suppress after concluding the defendants' statements were not made during custodial interrogation.[53]  The district court concluded that the questioning did not violate the defendants' *Miranda* rights.[54]  After a two-day trial, the jury found both Campos-Ayala and Moncada-De La Cruz guilty.[55]  Each was sentenced to the statutory minimum term of five years of imprisonment.[56]  The district court then issued an order denying their motions to dismiss, concluding that the government did not violate the defendants' due process rights by removing Castro-Hernandez.[57]

On appeal, the defendants raise three issues.  First, both Campos-Ayala and Moncada-De La Cruz argue that the evidence was insufficient to support their convictions.  Second, Campos-Ayala contends that the district court erred by not suppressing his inculpatory statements to Agent Ramos because he was not warned of his *Miranda* rights.  Third, both defendants assert that the government improperly removed Castro-Hernandez, making her unavailable to testify at trial.

---

[52] ROA.823-32; ROA.1718-27.

[53] ROA.409-10.

[54] ROA.409-10.

[55] ROA.153-54.

[56] ROA.765.

[57] ROA.9.

No. 21-50642

## II

Every defendant is constitutionally entitled to proof beyond a reasonable doubt in order to be convicted of violating a criminal law.[58] This principle is "basic in our law and rightly one of the boasts of a free society."[59] It is for this reason the Due Process Clause requires the government to put forth sufficient evidence to establish *every element* of a criminal offense.[60]

Under 21 U.S.C. § 841(a)(1) and (b)(1)(B), to sustain a conviction for possession of a controlled substance with intent to distribute, the government must prove: "(1) knowledge, (2) possession, and (3) intent to distribute the controlled substance."[61]

## A

Under our caselaw, possession "may be actual or constructive."[62] A defendant has actual possession if he "knowingly has direct physical control over a thing at a given time."[63] A defendant has constructive possession if he "had (1) ownership, dominion or control over the item itself or (2) dominion or control over the premises in which the item is found."[64] In other words,

---

[58] *In re Winship*, 397 U.S. 358, 362-64 (1970).

[59] *Id.* at 362 (quoting *Leland v. Oregon*, 343 U.S. 790, 803 (1952) (Frankfurter, J., dissenting)).

[60] *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).

[61] *United States v. Lopez-Monzon*, 850 F.3d 202, 206 (5th Cir. 2017) (quoting *United States v. Patino-Prado*, 533 F.3d 304, 309 (5th Cir. 2008)).

[62] *United States v. McCowan*, 469 F.3d 386, 390 (5th Cir. 2006) (footnote omitted) (quoting *United States v. De Leon*, 170 F.3d 494, 496 (5th Cir. 1999)).

[63] *United States v. Meza*, 701 F.3d 411, 419 (5th Cir. 2012) (quoting *United States v. Munoz*, 150 F.3d 401, 416 (5th Cir. 1998)).

[64] *Id.*

"the government must establish [an] adequate nexus between the accused and the prohibited substance."[65]

**1**

Consider first the evidence indicating the defendants were in the presence of marihuana. As noted by the majority opinion, "the defendants voluntarily surrounded themselves with what was admittedly a controlled substance" and "made no effort to exit the car or thwart the enterprise."[66] The majority opinion suggests this evidence alone is "enough to establish" possession.[67] But our caselaw firmly establishes otherwise. We have consistently held that "[m]ere presence in the area where drugs are found is insufficient to support a finding of possession."[68] "[W]e have not hesitated to reverse a conviction when the evidence has shown only that the defendant ran with bad company . . . ."[69]

---

[65] *United States v. Benbrook*, 40 F.3d 88, 94 (5th Cir. 1994).

[66] *Ante*, at 14.

[67] *Ante*, at 14 (listing evidence and observing that "any one of which is enough to establish sufficiency of the evidence").

[68] *United States v. Cordova-Larios*, 907 F.2d 40, 42 (5th Cir. 1990); *see also United States v. Gordon*, 700 F.2d 215, 217 (5th Cir. 1983) (reversing defendant's conviction for possession of marihuana with intent to distribute when the defendant was only present in the vehicle with the drugs and no other evidence connected him to drugs); *United States v. Ferg*, 504 F.2d 914, 917 (5th Cir. 1974) ("The facts of this case illustrate the logic of this 'mere presence' rule. The government presents only two pieces of circumstantial evidence in an attempt to link Ferg with the seized marijuana. Ferg was traveling with Shaw, the person who admitted having purchased the marijuana, and Ferg was a passenger in the car in which the marijuana was concealed. Beyond the admission by Ferg that he was a traveling companion of one guilty of illegal possession of marijuana, the government failed to establish that Ferg in any way violated 21 U.S.C. § 841(a)(1).").

[69] *United States v. Sandoval*, 847 F.2d 179, 185 (5th Cir. 1988).

No. 21-50642

Our decision in *United States v. Moreno-Hinojosa*[70] elucidates this point.  There, the government obtained a conviction against a defendant who was a passenger in a tractor-trailer rig containing roughly 450 pounds of marihuana.[71]  At trial, the government alleged the defendant—a friend of the driver—knew that the marihuana was in the truck and was a willing participant in the scheme to transport it.[72]  We reversed the conviction.  Our court observed that even if the defendant knew the driver was illegally distributing marihuana, "this fact would not be sufficient evidence to establish his possession without an additional showing that he was riding in the truck to participate in the possession and distribution."[73]  We held that to establish possession, "the government must show that [the defendant] controlled, or had the power to control, the truck or the marihuana; mere proximity to the drugs is not enough."[74]

Despite the factual similarities between *Moreno-Hinojosa* and the present case, the majority opinion overlooks our "mere presence" jurisprudence.  In fact, the en banc majority opinion concludes that the defendants' presence in the car alone is "enough to establish sufficiency of the evidence."[75]  This contention directly contradicts our holding in *Moreno-Hinojosa*.  Whether the en banc majority intends to overrule *Moreno-Hinojosa* *sub silentio* and the rest of our "mere presence" jurisprudence is unclear.

---

[70] 804 F.2d 845 (5th Cir. 1986).

[71] *Id.* at 846.

[72] *Id.*

[73] *Id.* at 847.

[74] *Id.*

[75] *Ante*, at 14.

**2**

Next, consider the evidence that the defendants "handled and rearranged the contraband."[76]  Under our caselaw, "mere touching" is insufficient to establish possession.[77]  Instead, we require evidence that a defendant had actual possession of the contraband in the form of "direct physical control" or constructive possession of the contraband in the form of "ownership, dominion, or control."[78]  Either way, our court has repeatedly identified control as the hallmark of possession.[79]

The government maintains that because the defendants rearranged the prepackaged marihuana to enter the vehicle, they had "direct physical control" over the drugs and were in actual possession of the marihuana.[80]  I disagree.  The operative inquiry is whether rearranging prepackaged drugs to enter the vehicle constitutes "mere touching" or the level of control associated with possession.  In my view, to define the defendants' interaction with the marihuana as "possession" stretches that word beyond recognition.

---

[76] *Ante*, at 14.

[77] *United States v. Smith*, 997 F.3d 215, 223-24 (5th Cir. 2021) (holding the district court erred in treating the defendant's admission to "touching" a firearm as a sufficient factual basis for his guilty plea); *see also United States v. De Leon*, 170 F.3d 494, 498 (5th Cir. 1999) (holding that "dominion and control" language in jury instructions "implicitly instruct[s]" the jury that "simply touch[ing]" is insufficient to establish possession).

[78] *United States v. Hagman*, 740 F.3d 1044, 1048-49 (5th Cir. 2014).

[79] *See, e.g.*, *United States v. Moreno-Hinojosa*, 804 F.2d 845, 847 (5th Cir. 1986) ("[T]he government must show that [the defendant] controlled, or had the power to control, the truck or the marihuana . . . .").

[80] Government EB Br. at 12-13.

No. 21-50642

To possess something, a defendant must "be master of" the thing or "have and hold it as property."[81]  The definition of possession includes "[t]he fact of having or holding property in one's power"[82] and "[t]o have in one's actual control."[83]  These definitions are consistent with the common usage of the term in our caselaw: that the defendant has some right or ability to control the disposition of the contraband.[84]  In *United States v. Smith*,[85] we explained that "to possess something is to control it—it is 'to be master of' the thing."[86]  We further observed that "[n]o one would confuse the simple act of laying a hand or finger on an item, on its own, as making someone the 'master' over the item."[87]

Here, the government failed to produce any evidence suggesting that Campos-Ayala and Moncada-De La Cruz held the bundles of marihuana in their power or could control the disposition of the drugs.  There was no indication they could use, consume, or sell the marihuana, or move it from

---

[81] *Possess*, Webster's New International Dictionary 1926 (2d ed. 1934).

[82] Bryan A. Garner, Dictionary of Legal Usage 688 (3d ed. 2011).

[83] *Possess*, Black's Law Dictionary (11th ed. 2019).

[84] *See, e.g.*, *United States v. Smith*, 997 F.3d 215, 219 n.5 (5th Cir. 2021) ("[B]oth kinds of possession—actual and constructive—require the Government to demonstrate control over an item."); *United States v. Moreland*, 665 F.3d 137, 142 (5th Cir. 2011) ("Possession is defined as 'the holding or having something (material or immaterial) as one's own, or in one's control.'" (quoting *Possession*, Oxford English Dictionary (2d ed. 1989))); *United States v. Phillips*, 496 F.2d 1395, 1397 (5th Cir. 1974) ("[P]ossession may be actual or constructive but in any event there must be dominion and control over the item or a power to exercise dominion and control.").

[85] 997 F.3d 215 (5th Cir. 2021).

[86] *Id.* at 221 (quoting *Possess*, Webster's New International Dictionary 1926 (2d ed. 1934)).

[87] *Id.*

36

the car. On the contrary, the evidence presented by the government established that the driver was the sole possessor—or "master"[88]—of the contraband. The government conceded the defendants did not know the driver;[89] that the marihuana was not in the car when they first accepted a ride;[90] and that the driver intentionally dropped them off before going to obtain the marihuana by himself.[91] Even the government's own witness, Agent Bustamante, affirmed that the defendants adjusted the marihuana only to accommodate themselves in the vehicle.[92] These facts are inconsistent with the argument that the defendants controlled the marihuana.

Despite evidence to the contrary, according to the majority, the moment the defendants adjusted the marihuana to enter the "stranger['s]"[93] vehicle, they were in actual possession of the drugs.[94] But the mere act of rearranging an item should not be equated with having mastery or control over it. As the Seventh Circuit aptly put it, to obtain control over drugs, "a defendant needs more than just mere physical contact; he must have the perceived right among the criminals with whom he is interacting to deal, use, transport, or otherwise control what happens to the drugs."[95]

---

[88] *See Smith*, 997 F.3d at 221.

[89] Government EB Br. at 66 (observing Campos-Ayala was "a passenger in a car driven by someone he did not know").

[90] ROA.652; Government EB Br. at 20.

[91] ROA.652; Government EB Br. at 20.

[92] ROA.615-16.

[93] *Ante*, at 23.

[94] *Ante*, at 14.

[95] *United States v. Lane*, 267 F.3d 715, 718 (7th Cir. 2001), *abrogation on other grounds recognized by United States v. Williams*, 946 F.3d 968, 970 (7th Cir. 2020); *see also United States v. Edwards*, 166 F.3d 1362, 1364 (11th Cir. 1999) ("We have previously held

No. 21-50642

When the only evidence in a case indicates the defendants lacked control over the contraband, as here, there is insufficient evidence for a jury to conclude the defendants possessed the controlled substance.

**3**

Lastly, consider the statements Campos-Ayala made that he "possess[ed]"[96] and "just helped"[97] with the marihuana. The majority opinion characterizes these statements as the "[p]erhaps most important[]" evidence offered by the government for proving the crime.[98] But these words must be considered in context.

Start with the statement "I just helped."[99] Campos-Ayala said this at the scene of the arrests following a series of questions by Agent Ramos. The agent initially asked, "Why did you help with the drugs?" to which Campos-Ayala responded, "I didn't."[100] Agent Ramos then asked, "Why did you cross with the drugs?" to which Campos-Ayala responded, "I didn't, I just helped."[101] This statement—made in Spanish and translated as "I just helped"—accords with Moncada-De La Cruz's admission that the defendants helped rearrange the bundles of marihuana to allow the

―――――――――――――――――

that mere inspection of contraband, standing alone, is not sufficient to establish possession."); *United States v. Kearns*, 61 F.3d 1422, 1425 (9th Cir. 1995) ("We hold that [the defendant's] brief sampling of the marijuana, in the absence of other steps taken to give him physical custody of or dominion and control over the drugs, is not sufficient to constitute 'possession.'").

[96] ROA.655.

[97] ROA.370.

[98] *Ante*, at 15.

[99] ROA.515.

[100] ROA.514.

[101] ROA.515.

passengers to fit in the compact car.[102]  As explained above, that does not mean the defendants controlled the marihuana.  In context, rather than admitting anything, Campos-Ayala's statement merely corroborates the defendants' accounts of what transpired.

Next, consider the statement Campos-Ayala made regarding "possession."[103]  After DEA agents explained the charges against him, Campos-Ayala responded, "Well, I guess that's how it goes.  Yes, I was in possession of the marijuana."[104]  Again, this statement was translated from Spanish and made in a specific context.  The record indicates that the DEA agent who testified at trial interpreted Campos-Ayala to be "mak[ing] a statement that he understood what his charge was" after they explained the charges against him.[105]  Taken in context, the statement—"I was in possession of the marijuana"[106]—can most readily be taken to mean Campos-Ayala comprehended that the officers were telling him his actions constituted possession.  It does not mean that Campos-Ayala agreed, as a legal proposition, that he possessed the marihuana within the meaning of 21 U.S.C. § 841(a)(1).

**B**

Turning to intent to distribute, the majority opinion fixates on a "mysterious phone call" and the fact that Campos-Ayala was found with two

---

[102] ROA.615 (Moncada-De La Cruz stated "that he helped rearrange [the bundles] so that everybody could fit inside the vehicle").

[103] ROA.655.

[104] ROA.655.

[105] ROA.655.

[106] ROA.655.

phones.[107]   The majority opinion suggests this evidence indicates the passengers were implicated in the driver's drug-distribution scheme at the outset.[108]   With due respect, the en banc majority—sitting in its "ivory tower"[109]—recasts the record from the bench.

Simply put, there is no evidence in the record that the phones were associated with a drug-distribution scheme.  The government's witness, Agent Kettani, testified there was no suspicious activity on the phones and admitted the DEA did not do a "phone dump" to analyze the call logs, data history, or usage information to connect the phones to the drugs.[110]  In fact, the government conceded that "[t]here is *no evidence* [the defendants] began their venture into the U.S. with the purpose of possessing with intent to distribute marijuana."[111]   The government has further conceded that the defendants were "passenger[s] in a car driven by someone [they] did not know."[112]

Despite these concessions, the majority opinion glosses over the record and contends the jury "could reasonably draw the inference" that the defendants were part of a larger drug-distribution scheme at the outset.[113]  I

---

[107] *Ante*, at 8-11, 14.

[108] *Ante*, at 10.

[109] *Ante*, at 16.

[110] ROA.656-57 (Agent Kettani stating "[n]othing in the phones really stuck out to me that they would have to be urgently processed by our intel analyst"); *see also* ROA.625 (Agent Bustamante admitting the DEA "has the technology to dump [the] phones to give us text messages, phone calls, received, incoming").

[111] Government Br. at 27 (emphasis added); *see also* Government EB Br. at 43.

[112] Government Br. at 39.

[113] *Ante*, at 10.

disagree; "[i]nferences must stop at some point."[114]  The Due Process Clause requires courts to consider "whether the inferences drawn by a jury were rational, as opposed to being speculative or insupportable."[115]  By connecting the cell phones to the drug-distribution scheme, the majority opinion makes several "leaps of logic, none of which is substantiated by evidence."[116]  The government produced no evidence connecting the phones—or the "mysterious phone call"[117]—to the driver's drug-distribution scheme.  No government agent or other witness testified that the defendants crossed the border with the intention to transport or distribute drugs.  Instead, the government has continued to take the position that Campos-Ayala and Moncada-De La Cruz illegally crossed the border with the purpose of getting to Odessa, Texas.[118]  In this respect, the majority opinion advances a theory that the government (understandably) disclaims.

Under the government's theory, Campos-Ayala and Moncada-De La Cruz joined the drug-distribution scheme when they rearranged the marihuana to enter the vehicle at the roadside park.[119]  The government

---

[114] *United States v. Crain*, 33 F.3d 480, 487 (5th Cir. 1994).

[115] *United States v. Vargas-Ocampo*, 747 F.3d 299, 302 (5th Cir. 2014) (en banc); *see also Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (affirming the Due Process Clause forbids conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged" (quoting *In re Winship*, 397 U.S. 358, 364 (1970))); *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996) ("[A] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference.").

[116] *Armour v. Knowles*, 512 F.3d 147, 155 (5th Cir. 2007).

[117] *Ante*, at 8.

[118] Government Br. at 27 ("While they might not have set out on their journey from Mexico with the purpose of transporting marijuana, the jury could reasonably conclude that they joined in that crime to accomplish their own goals in Van Horn.").

[119] Government Br. at 27.

argues this evidence alone is sufficient to support a conviction for possession with intent to distribute.[120]

To reach this conclusion, the government applies our "personal use" jurisprudence, which allows the jury to infer an intent to distribute when the defendant possesses a quantity of drugs inconsistent with personal use.[121] According to the government, because Campos-Ayala and Moncada-De La Cruz touched the marihuana at the roadside park, they possessed the marihuana; and because the quantity of the marihuana was approximately 283 pounds, those two facts—touching and quantity—are sufficient to support a conviction for possession with intent to distribute.

But consider the implications of the government's position. Assume, for a moment, the government's broad definition of possession is correct: A person is in possession of marihuana when they touch or rearrange marihuana in any way. Now imagine a guest (a pastor or family member, for example) enters a residence to express concerns about the occupant's drug use, sees a large bundle of marihuana on the sofa, and moves the bundle to sit while attempting an intervention. Is that possession with intent to distribute? I cannot imagine this is the conduct § 841(a)(1) punishes, specifically when the

---

[120] Government Br. at 27-28; Government EB Br. at 42.

[121] *See, e.g.*, *United States v. Valdez*, 453 F.3d 252, 260 n.7 (5th Cir. 2006) ("Intent to distribute may be inferred from the large quantity of drugs involved."); *United States v. Cain*, 440 F.3d 672, 674 (5th Cir. 2006) (noting the jury's task is "to determine whether the quantity is consistent with personal use and, if so, to find no inference of an intent to distribute without other evidence"); *United States v. Kates*, 174 F.3d 580, 582 (5th Cir. 1999) (per curiam) ("Intent to distribute may be inferred from the possession of a quantity of drugs too large to be used by the defendant alone. Possession of a small quantity of illegal drugs consistent with personal use does not support an inference of intent to distribute in the absence of other evidence, such as drug paraphernalia, guns, or large quantities of cash." (citation omitted)).

government's only evidence indicates the defendant touched the marihuana for a purpose other than distribution.

In the majority opinion's view, the moment Campos-Ayala and Moncada-De La Cruz rearranged the bundles of marihuana to fit in the compact car, the defendants were in possession of the marihuana and the jury could infer an intent to distribute.

The extent to which the majority opinion blesses the drawing of "inferences" as a substitute for evidence exceeds the limits of what may reasonably be inferred. The majority opinion's musings amount only to conjecture. For example, the opinion says in a bullet point that "[t]he substantial possibility that the initial encounter with the driver was pre-arranged as part of some sort of illegal enterprise" is some evidence on which a finding of possession with intent to distribute could be based.[122] Let's parse this, beginning with a "substantial possibility." That does not approach proof. And then there is "some sort of illegal enterprise." The defendants were not convicted and sentenced to five years in prison for some unspecified "illegal enterprise." They were convicted of possession with intent to distribute. They were unquestionably guilty of illegal entry into this country. The initial encounter with the driver might have been pre-arranged as part of their illegal entry. But a factfinder should not be permitted to leap to the conclusion that a (possibly) pre-arranged encounter with a driver in a vehicle that has no controlled substances in it is evidence of intent to distribute 283 pounds of marihuana. The same can be said of the next bullet point, which is "[t]he suspicious phone call under the bridge, conveniently followed by the arrival of a friendly driver offering a ride."[123]

---

[122] *Ante*, at 14.

[123] *Ante*, at 14.

Then there is "Campos's possession of two phones."[124] Really? That evidence is in and of itself sufficient to sustain a conviction for possession with intent to deliver 283 pounds of marihuana?

Next up is: "The lack of an explanation of how it was possible for the teenage driver to load five large bundles of marijuana, weighing about 280 pounds, into the cramped space of a small vehicle, all by himself, in about 30 minutes including travel time (raising the natural inference that, instead, the defendants were recruited, from the very beginning, to assist in loading, arranging, and unloading the contraband)."[125] Even the government does not contend there is evidence that the defendants were recruited "from the very beginning, to assist in loading, arranging, and unloading the contraband." That aside, can the weight of the bundles reasonably give rise to such an inference? The five bundles together weighed 283 pounds, which means on average, they weighed 56.6 pounds each. Dog food kibble is frequently sold in 40-pound bags. Luggage weighing up to 50 pounds can be checked at the airport. Fifty-pound bags of sugar and of flour and of lawn products are available for purchase by consumers. It is common knowledge that many if not most 17-year-old males could manage to lift 56.6 pounds. It is even common knowledge that some, though certainly not all, 70-year-old females could manage to lift at least 50 pounds. Common sense also tells us that it would not take all that long to move five bundles weighing 56.6 pounds. It is also plausible that the driver could have had help from one or more people when he picked up the marijuana bundles. Speculation as to what might or might not have happened cannot be a substitute for evidence as to what actually did happen.

_____

[124] *Ante*, at 14.

[125] *Ante*, at 14-15.

Also among the bullets is this: "The fact that the trip from Presidio to Van Horn was way out of the way of the defendants' supposed destination, which would have been a trip from Presidio to Odessa."[126]  Even the government does not argue this.  Where is the evidence that the defendants had the right or ability to direct what route the driver took or whether he planned to go to other destinations before heading to Odessa?  I submit that the evidence strongly suggests the passengers had little or no control over the driver's route.

The other bullet points in the majority opinion are addressed elsewhere in this opinion.  With the utmost respect for my colleagues, the Due Process Clause requires more than conjecture.  The government has a burden to put forth sufficient evidence to prove every element of a criminal offense beyond a reasonable doubt;[127] it did not meet that burden here.  "[A] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."[128]  The evidence connecting Campos-Ayala and Moncada-De La Cruz to the marihuana was insufficient for the jury to find that the defendants had possession—much less possession with intent to distribute—beyond a reasonable doubt.

### III

Contrary to the majority opinion, I would hold that the district court erred in admitting statements made by Campos-Ayala to federal agents at the scene of the arrest.  The defendant made these statements while subjected to custodial interrogation without receiving *Miranda* warnings.

---

[126] *Ante*, at 15.

[127] *Jackson v. Virginia*, 443 U.S. 307, 316-19 (1979).

[128] *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[129]   To safeguard the privilege against self-incrimination and counteract the "inherently compelling pressures" of custodial interrogation, a suspect must receive *Miranda* warnings.[130]     Statements stemming from custodial interrogation without *Miranda* warnings may not be used as evidence to establish guilt.[131]

Whether a suspect is "in custody" for *Miranda* purposes "is an objective inquiry."[132]  The Supreme Court has "emphasized" that "[t]wo discrete inquiries are essential to the determination."[133]    The Court elaborated in *J.D.B. v. North Carolina*:[134]

> [F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.[135]

---

[129] U.S. Const. amend. V.

[130] *Miranda v. Arizona*, 384 U.S. 436, 444, 467 (1966) (holding that officers must inform suspects that they have a right to remain silent, that anything they say may be used as evidence against them, and that they are entitled to the presence of an attorney, either retained or appointed, prior to the interrogation).

[131] *Id.* at 444.

[132] *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).

[133] *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

[134] 564 U.S. 261 (2011).

[135] *Id.* (quoting *Keohane*, 516 at 112).

No. 21-50642

A year after its decision in *J.D.B.*, the Court provided additional guidance in *Howes v. Fields*,[136] explaining that "the initial step" of determining whether someone is in custody for *Miranda* purposes "is to ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'"[137] In this regard, the *Howes* decision explained that "in order to determine how a suspect would have 'gauge[d]' his 'freedom of movement,' courts must examine 'all of the circumstances surrounding the interrogation.'"[138] The *Howes* opinion set forth factors pertinent to this assessment, including the "duration" of the encounter,[139] "statements made during the interview,"[140] "the presence or absence of physical restraints during the questioning,"[141] and "the release of the interviewee at the end of the questioning."[142]

The *Howes* decision then explained that "[d]etermining whether an individual's freedom of movement was curtailed [under the freedom-of-movement test], however, is simply the first step in the analysis, not the last."[143] The *Howes* decision reminds us that "[n]ot all restraints on freedom

---

[136] 565 U.S. 499 (2012).

[137] *Id.* at 509 (alteration in original) (citation omitted) (first quoting *Stansbury v. California*, 511 U.S. 318, 322-23 (1994) (per curiam); and then quoting *Keohane*, 516 U.S. at 112).

[138] *Id.* (alteration in original) (quoting *Stansbury*, 511 U.S. 325).

[139] *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984)).

[140] *Id.* (first citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam); then citing *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004); and then citing *Stansbury*, 511 U.S. at 325).

[141] *Id.* (citing *New York v. Quarles*, 467 U.S. 649, 655 (1984)).

[142] *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1122-23 (1983) (per curiam)).

[143] *Id.*

of movement amount to custody for purposes of *Miranda*."[144]  For example, "the roadside questioning of a motorist who was pulled over in a routine traffic stop [does] not constitute custodial interrogation," even though "[f]ew motorists . . . would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so."[145]  Indeed, "a person detained as a result of a traffic stop is not in *Miranda* custody."[146]  That is "because such detention does not 'sufficiently impair [the detained person's] free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.'"[147]  The Supreme Court's "cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody."[148]  The Supreme Court has directed courts to "instead ask[] the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."[149]

"[T]he temporary and relatively nonthreatening detention involved in a traffic stop . . . does not constitute *Miranda* custody."[150]  However, traffic stops may become custodial.  "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of

---

[144] *Id.*

[145] *Id.* at 509-10 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984)).

[146] *Id.* at 510.

[147] *Id.* at 510 (alteration in original) (quoting *Berkemer*, 468 U.S. at 437).

[148] *Id.* at 509 (omission in original) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)).

[149] *Id.*

[150] *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010).

protections prescribed by *Miranda*."[151]  The operative inquiry is whether, given the circumstances, "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."[152]

When analyzing whether an officer's conduct during a traffic stop moved the encounter beyond "routine" to "custodial" our court considers several factors, including: "(1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory, nature of the questioning; (4) the amount of restraint on the individual's physical movement; and (5) statements made by officers regarding the individual's freedom to move or leave."[153]  We also consider "the presence of other officers at the location,"[154] the length of the detention,[155] and whether officers confiscated the suspect's belongings.[156]  Ultimately, this is an objective inquiry rooted in the "totality of circumstances."[157]

---

[151] *Berkemer*, 468 U.S. at 440.

[152] *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc).

[153] *United States v. Nelson*, 990 F.3d 947, 955 (5th Cir. 2021).

[154] *United States v. Cavazos*, 668 F.3d 190, 194 n.3 (5th Cir. 2012).

[155] *United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990) (agreeing with the defendant that a "detention of approximatley [sic] an hour raises considerable suspicion" that the individual was subjected to a custodial interrogation).

[156] *See United States v. Chavira*, 614 F.3d 127, 134 (5th Cir. 2010) ("Chavira's birth certificate and Texas identification were both confiscated.  Had she wanted to leave, she would have to first retrieve her belongings from the Government."); *United States v. Salinas*, 543 F. App'x 458, 464-65 (5th Cir. 2013) (per curiam) (unpublished) (recognizing that "the retention of the phones, like the retention of the identifying documents in *Chavira*, is some evidence that the encounter was custodial").

[157] *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *see also United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015) (recognizing that "no one fact is determinative").

No. 21-50642

In arguing that Campos-Ayala was not "in custody," the majority opinion mischaracterizes the interaction as "the early phase of a traffic stop."[158] While the encounter may have started as a traffic stop, the situation evolved into *Miranda* custody when officers subjected the motorist "to treatment that render[ed] him 'in custody' for practical purposes."[159] In other words, "the case changed from" an investigatory stop "to an essentially criminal law enforcement case."[160] The facts are unlike a "routine traffic stop" and instead are consistent with detention for the purpose of arrest.

Consider the encounter. Troopers with the Texas Department of Public Safety pulled over the vehicle and immediately removed the driver, handcuffed him, and seated him alongside the highway as they waited for U.S. Border Patrol.[161] Trooper Foster testified that the passengers were then instructed to "stay inside the car" and that he did not allow them to exit the vehicle.[162] By the time Border Patrol arrived at the scene, Campos-Ayala had been held in the vehicle for forty minutes, jammed between the 50-pound bundles of marihuana with no ability to move or exit the compact car. While in this compromising position, Campos-Ayala watched as the juvenile driver, the mother, and the six-year-old girl were loaded into a cage of a Border Patrol transport van.[163] Officers then removed Campos-Ayala from the vehicle, confiscated his belongings, and escorted him to the transport van. The

---

[158] *Ante*, at 23.

[159] *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

[160] *Chavira*, 614 F.3d at 133.

[161] ROA.429-30.

[162] ROA.390.

[163] Campos-Ayala EB Br. at 52-53.

majority opinion nevertheless maintains this situation was still in "the early phase of a traffic stop."[164] I disagree.

When Agent Ramos approached the vehicle—after escorting the mother and her daughter to the transport van—and began questioning Campos-Ayala about the marihuana, an objectively reasonable person in Campos-Ayala's position would have thought himself subject to arrest.

First, the nature of Agent Ramos's questioning was accusatory. Questions such as "[d]o you know what you're on?"; "[t]he weed, right?"; "[w]hy did you help with the drugs?"; "[w]hy did you cross with the drugs?"; and "[y]ou have a lot of people that you have to call for the drugs?" were intended to establish elements of the crime such as knowledge and intent to distribute.[165] They were inculpatory questions. Regardless of the tone in which Agent Ramos asked these questions, it cannot be mistaken that the agent was implicating Campos-Ayala in criminal activity.[166]

Second, the extent of restraint on Campos-Ayala's physical movement was substantial. The majority opinion correctly observes that Campos-Ayala "was not placed into a patrol car, handcuffed, or removed from the scene before . . . questioning."[167] But these conditions are not dispositive.[168] Campos-Ayala was detained in the compact car for forty

---

[164] *Ante*, at 23.

[165] ROA.366; ROA.369-70; ROA.380; ROA.509; ROA.512; ROA.514-15.

[166] *Cf. United States v. Coulter*, 41 F.4th 451, 468 (5th Cir. 2022) (RICHMAN, C.J., dissenting) ("No matter how calmly asked or the tone of voice used, the question is an incriminatory, accusatory one.").

[167] *Ante*, at 23.

[168] *See United States v. Wright*, 777 F.3d 769, 774-75 (5th Cir. 2015) (emphasizing that "no one fact is determinative" in deciding whether a suspect is "in custody," rather this is an objective inquiry that depends on the totality of circumstances).

minutes, pinned against the car when he was removed, taken by the arm to the transport van, and had his personal belongings confiscated.[169]   He watched as officers handcuffed the driver and loaded the other passengers into the Border Patrol transport van.[170]   At no point did the officers allow Campos-Ayala to move freely.  He was not free to exit the vehicle.  He certainly was not free to walk away from the scene.

Nevertheless, the majority opinion downplays the role of the officers in restricting Campos-Ayala's movement.  The majority opinion asserts:

> Despite the fact that, as the district court stated, Campos was not free to leave, he was not—as a matter of law—in custody. It would have been unrealistic for him to think that he could leave the scene, but that was because he was a passenger in a car driven by a stranger; he was stopped in a remote, unfamiliar location; and he could not drive himself away or reasonably depart on foot.[171]

With due respect, this assertion turns a blind eye to the record.  Trooper Foster testified that "[he] didn't allow [the passengers] to get outside of the vehicle,"[172] and Agent Ramos confirmed that he "stood in the way of the door."[173]   When officers removed Campos-Ayala from the vehicle, he remained subject to their demands.  While extrinsic factors limited Campos-Ayala's ability to leave, those factors did not foreclose this possibility. Instead, it was the state and federal officers who physically restricted

---

[169] Foster Bodycam at 1:04; Foster Bodycam at 35:50-40:50; ROA.368-69; ROA.377-78; ROA.380; ROA.388-90; ROA.509; ROA.514-15.

[170] Campos-Ayala EB Br. at 52-53.

[171] *Ante*, at 23.

[172] ROA.390.

[173] ROA.378.

No. 21-50642

Campos-Ayala's movement. After all, the passengers had traveled on foot to enter the United States illegally. They were physically capable of walking away. In my view, the full picture of the scene illustrates why Campos-Ayala reasonably understood himself to be in custody—even the minor driver was prevented from leaving because he was handcuffed and removed from the vehicle.

The statements made by the officers made clear Campos-Ayala was not free to move or leave. Both Trooper Foster and Agent Ramos confirmed they instructed the defendant to remain in the vehicle on multiple occasions.[174] Moreover, neither officer gave Campos-Ayala any reason to think that he was being restrained for a limited, temporary purpose, such as to ensure officer safety. Unlike cases in which the suspect was specifically told they were not "under arrest" or "in custody,"[175] the officers here never told Campos-Ayala that he was free to leave or the purpose of the prolonged detention. Instead, the officers treated Campos-Ayala as if his arrest was inevitable.

In spite of the evidence as to the lengthy time the defendants were required to stay inside the vehicle wedged alongside or on top of the marihuana, and how and when questioning commenced, the majority opinion posits that "[t]he inquiry as to Campos's involvement with the marihuana

---

[174] ROA.377; ROA.390; *see also* Foster Bodycam at 1:04.

[175] *See United States v. Coulter*, 41 F.4th 451, 461 (5th Cir. 2022) ("[A]ssurances that a suspect '[is] not under arrest and that he [is] free to leave' weigh in favor of determining that a suspect is not in custody." (alterations in original) (quoting *United States v. Wright*, 777 F.3d 769, 777 (5th Cir. 2015))); *United States v. Cavazos*, 668 F.3d 190, 195 (5th Cir. 2012) (finding that telling the defendant an interview is "non-custodial" is not the equivalent of telling him "he could 'terminate the interrogation and leave'"); *United States v. McNair*, 444 F. App'x 769, 770 (5th Cir. 2011) (per curiam) (unpublished) (relying on the fact that officers told the defendant "he was not under arrest" and was "free to leave" to support a finding that interrogation was non-custodial).

was reasonably designed to ascertain whether the agents were dealing only with aliens or, instead, with a more serious situation posing a greater immediate risk."[176]  But it was patently obvious to all on the scene that day (as well as other travelers on the highway who saw the bundles and called authorities) that the bundles almost certainly contained marihuana.  And what was the danger to the officers from bundles of marihuana?  The officers, who were armed, could have ordered the defendants to exit the vehicle if there were concerns about safety.  Instead, the officers asked if the defendants knew they were riding next to or on top of marihuana and whether they had brought the marihuana across the border.  Those questions were not designed to ascertain if there was a "serious situation" or "immediate risk."

The majority opinion suggests that the defendants "were never really arrested until they were taken to the transport vehicle."[177]  Even on this understanding, Campos-Ayala was formally under arrest while being walked to the transport vehicle.  This would mean, at the very least, that Agent Ramos's question about why Campos-Ayala crossed with the drugs, and Campos-Ayala's response that he only "helped," are inadmissible under *Miranda*.  But, in my view, Campos-Ayala was formally arrested even earlier, specifically when Agent Ramos searched him before taking him to the transport vehicle.  That search operated more like a search incident to arrest than a temporary *Terry* frisk.[178]  While no weapons were found on Campos-Ayala, he was arrested and walked to the transport vehicle immediately after.  This would mean that Agent Ramos's questions accompanying the search

---

[176] *Ante*, at 23.

[177] *Ante*, at 22 (quoting the district court).

[178] *See Terry v. Ohio*, 392 U.S. 1 (1968).

incident to arrest—regarding Campos-Ayala's two phones—were also inadmissible under *Miranda*.

Regardless, when viewed in totality, the encounter was far from "the early phase of a traffic stop" and any other stage of a traffic stop.[179] Several of the aforementioned factors—such as the accusatory questioning, restraint on physical movement, and the statements by officers telling the defendant to stay in the car[180]—counsel in favor of finding that a reasonable person in Campos-Ayala's position "would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."[181]

The custody inquiry must also focus on "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."[182] Specifically, we must determine whether Campos-Ayala was subjected to "incommunicado interrogation . . . in a police-dominated atmosphere,"[183] whether he was placed in an inherently stressful situation,[184] and whether his "freedom of action [was] curtailed in any significant way."[185]

The majority opinion asserts: "The roadside questioning before [Campos-Ayala] was placed into the transport van did not subject him to the

---

[179] *Ante*, at 23.

[180] *See United States v. Nelson*, 990 F.3d 947, 955 (5th Cir. 2021).

[181] *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc).

[182] *Howes v. Fields*, 565 U.S. 499, 509 (2012).

[183] *Miranda v. Arizona*, 384 U.S. 436, 445 (1966).

[184] *See id.* at 468.

[185] *Id.* at 467.

type of police interrogation that we have described as coercive."[186]  In the majority's view, the roadside environment did not exert coercive pressures akin to *Miranda* custody because it was in public and involved routine questioning incident to a traffic stop.  But the features of an ordinary traffic stop that would mitigate the coercive pressures of *Miranda* custody were not present here.

In *Berkemer v. McCarty*,[187] the Supreme Court emphasized that "[t]wo features of an ordinary traffic stop mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'"[188]  First, traffic stops are "presumptively temporary and brief," "last[ing] only a few minutes," setting them apart from "stationhouse interrogation, which frequently is prolonged."[189]  Second, as the Court explained, "the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself."[190]  The Court recognized that routine traffic stops typically involve "one or *at most* two policemen."[191]  Here, there were six federal and state officers surrounding the vehicle as Agent Ramos questioned Campos-Ayala.[192]  After nearly forty minutes of detention, the environment bore little resemblance to an ordinary traffic stop.  Trooper Foster's bodycam footage reveals the compromising position from

_____

[186] *Ante*, at 23.

[187] 468 U.S. 420 (1984).

[188] *Id.* at 437 (quoting *Miranda*, 384 U.S. at 467).

[189] *Id.* at 437-38.

[190] *Id.* at 438-39 (quoting *Miranda*, 384 U.S. at 445).

[191] *Id.* at 438 (emphasis added).

[192] ROA.371.

which Campos-Ayala was initially questioned, jammed between bundles of marihuana:[193]



Against this backdrop, I would hold that this roadside environment was sufficiently coercive for *Miranda* purposes. Campos-Ayala (1) was surrounded by six armed, uniformed officers; (2) was verbally instructed not to leave the car and was physically restrained from doing so for forty minutes; (3) was told he would be searched; (4) watched as the handcuffed driver and other passengers were taken to the transport van; (5) was frisked and had his hands pushed forward onto the car doors; (6) had his possessions confiscated; (7) was asked accusatory questions; (8) was physically escorted to the transport van; and (9) was never told he was not under arrest or would be free to leave after a brief detention.

---

[193] Foster Bodycam at 37:00.

No. 21-50642

The majority opinion, however, holds that as a matter of law Campos-Ayala was not subject to custodial interrogation.[194]  In light of this en banc decision, it is difficult to imagine when—if ever—a routine traffic stop may evolve into *Miranda* custody in our circuit.

## IV

Another troubling aspect of today's decision is its usurpation of the constitutional guarantee that all criminal defendants have the right to mount an effective defense.  The government knowingly removed the *only* available eyewitness—Karina Castro-Hernandez—who could testify on behalf of the defendants.  This violated the defendants' due process and compulsory process rights.  The majority opinion incorrectly applies the Supreme Court's controlling decision in *United States v. Valenzuela-Bernal.*[195]  The majority opinion holds that because the Executive Branch must faithfully execute immigration policy, the government could deport the only material witness in this case even though she possessed information favorable to the defendants.[196]  That is not what *Valenzuela-Bernal* held.  Accordingly, I would hold the district court erred in denying the defendants' motions to dismiss.

Under *Valenzuela-Bernal*, Campos-Ayala and Moncada-De La Cruz must demonstrate that Castro-Hernandez's testimony would have been material, favorable, and non-cumulative.[197]  While several of our sister circuits require an additional showing that the government acted in bad faith

---

[194] *Ante*, at 23.

[195] 458 U.S. 858 (1982).

[196] *Ante*, at 19-20.

[197] *Valenzuela-Bernal*, 458 U.S. at 873.

in causing the unavailability of the alien witness,[198] our court has never adopted such a requirement, and the en banc court does not adopt a bad-faith requirement today.[199]  We therefore must assess the materiality, favorability, and cumulative nature of Castro-Hernandez's testimony.[200]  Review is de novo.[201]

It is important to recognize the unique circumstances of this case. Castro-Hernandez was the only witness who could testify about the events leading up to and during the car ride.  The record reflects that only five people observed all or some of those events: the minor driver, a six-year-old girl, the two defendants, and Castro-Hernandez.  The driver (once he reached the age of majority) pleaded the Fifth Amendment, and the six-year-old girl was too young to provide competent testimony to the jury.[202]  Therefore, unless the defendants "waived [their] constitutional right not to take the stand in [their] own defense," Castro-Hernandez was their "one material witness."[203]  The government nevertheless deported her.

In *United States v. Valenzuela-Bernal*, the Supreme Court held that irrespective of its responsibility to execute immigration policy, the Executive

---

[198] *See United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000); *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1085 (9th Cir. 2000); *United States v. Iribe-Perez*, 129 F.3d 1167, 1173 (10th Cir. 1997).

[199] *See United States v. Gonzales*, 436 F.3d 560, 579 (5th Cir. 2006) (declining to address whether a showing of bad faith is required), *abrogated on other grounds by United States v. Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc).

[200] *Valenzuela-Bernal*, 458 U.S. at 873.

[201] *United States v. Perez*, 217 F.3d 323, 326 (5th Cir. 2000).

[202] ROA.403.

[203] *Roviaro v. United States*, 353 U.S. 53, 64 (1957).

No. 21-50642

Branch violates a defendant's due process rights if it deports a witness who has information that is both favorable and material to the defense:

> To summarize, the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they *possess no evidence favorable to the defendant in a criminal prosecution*. The mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment. A violation of these provisions *requires some showing that the evidence lost would be both material and favorable to the defense*.[204]

The government does not deny that Castro-Hernandez possessed evidence favorable to the defendants. The defendants made a sufficient showing that her testimony would have been both material and favorable to the defense. The government's own witnesses made that demonstration at trial. The decision in *Valenzuela-Bernal* does not say that due process is satisfied if the government offers hearsay testimony of law enforcement officials as to what the deported witness would have said at trial. Again, the credibility of Castro-Hernandez was critical, and there was no substitute for her first-hand account of all that transpired prior to the arrests.

The Court elaborated in *Valenzuela-Bernal* that to establish a violation of the Sixth Amendment right to compulsory process or the Fifth Amendment right to due process, a criminal defendant must make a "plausible showing that the testimony of the deported witness[] would have been material and favorable to his defense, in ways not merely cumulative to

---

[204] *Valenzuela-Bernal*, 458 U.S. at 872-73 (emphasis added).

the testimony of the available witnesses."[205]  The Court further concluded that "sanctions [would] be warranted for deportation of alien witnesses only if there [were] a reasonable likelihood that the testimony could have affected the judgment of the trier of fact."[206]  In this regard, the Supreme Court explained:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. . . .  This means that the omission must be evaluated in the context of the entire record.  If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.  On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."[207]

The materiality and favorability of the mother's testimony are beyond dispute.  The defendants established that Castro-Hernandez was the *only* available eyewitness who could corroborate their version of events, and they demonstrated that her testimony would pertain to their involvement—or lack thereof—in the driver's drug-distribution scheme.[208]

The majority opinion concludes that because DEA Agents Kettani and Bustamante "described [Castro-Hernandez's] story in detail" to the jury, Castro-Hernandez's live testimony would have been "merely cumulative."[209]  Put differently, the majority opinion declares the testimony

---

[205] *Id.* at 873.

[206] *Id.* at 873-74.

[207] *Id.* at 868 (quoting *United States v. Agurs*, 427 U.S. 97, 112-13 (1976)).

[208] ROA.826-27; ROA.1721-22.

[209] *Ante*, at 20.

of the *sole* eyewitness who could corroborate the defendants' version of events "merely cumulative" because two adverse government agents repeated the eyewitness's out-of-court statements at trial.[210]  With respect, this is fundamentally incorrect.

In *Valenzuela-Bernal*, the defendant was charged with transporting an illegal alien in violation of 8 U.S.C. § 1324(a)(2).[211]  Along with the driver, the government apprehended three of the car's passengers.[212]  The government deported two of them, determining that they "possessed no evidence material to the prosecution or defense."[213]  Nevertheless, the government retained the third "to provide a *nonhearsay basis* for establishing" what the defendant did.[214]  In holding that the deportation of the other two passengers did not violate the defendant's compulsory process or due process rights, the Supreme Court emphasized that the third passenger "remained fully available for examination by the defendant and his attorney."[215]

Two critical features from *Valenzuela-Bernal* are absent in this case: (1) the defendant in *Valenzuela-Bernal* had the opportunity to examine an eyewitness before and during trial, and (2) the government intentionally retained an eyewitness out of concern for offering hearsay evidence.  Yet, the majority opinion nevertheless erroneously concludes that Castro-

---

[210] *Ante*, at 20 (noting that "Castro's hearsay statements adequately protected these defendants' rights").

[211] *Valenzuela-Bernal*, 458 U.S. at 860.

[212] *Id.* at 861.

[213] *Id.*

[214] *Id.* (emphasis added).

[215] *Id.* at 871.

No. 21-50642

Hernandez's testimony would have been cumulative because the admission of her "hearsay statements adequately protected these defendants' rights."[216]  The majority opinion's broad declaration that "[t]he testimony of removed aliens is merely cumulative where other persons have imparted the same information"[217] ignores the simple fact that the defendants had no opportunity to examine the only available eyewitness in front of the jury.

What support does the majority offer for its novel position?  Only *United States v. Perez*,[218] in which the defendant had access to *six* other material eyewitnesses who would have imparted the same information as the deported illegal aliens.[219]  *Perez* does not support the majority's proposition that the testimony of the *only* eyewitness who can offer material, favorable, corroborating evidence is rendered "merely cumulative" if a government agent can repeat out-of-court statements made by the eyewitness.

But even if the majority opinion is correct on this point—which it certainly is not—Castro-Hernandez's testimony would not have been cumulative on its own terms.  For example, Castro-Hernandez could have responded to the majority opinion's assertion that it was not plausible for the defendants to believe that the driver "was going to transport them well over 200 miles, for free, for several hours, to their chosen destination of Odessa and to do so on Christmas Eve."[220]  Likewise, she could have testified to the majority opinion's supposition that "the defendants were recruited, from the very beginning, to assist in loading, arranging, and unloading the

---

[216] *Ante*, at 20.

[217] *Ante*, at 19.

[218] 217 F.3d 323 (5th Cir. 2000).

[219] *Id.* at 327.

[220] *Ante*, at 15.

contraband."[221]    Indeed, we would likely have answers to many of the majority opinion's inferences if not for the government prematurely deporting Castro-Hernandez.

Equally important is the fact that the government impeached its own witnesses in closing arguments before the jury as to whether Castro-Hernandez's statements to the arresting officers were credible.    The government asked the jury to believe that the defendants did not in fact stay behind at the rest stop before the driver reappeared with marihuana filling the vehicle.  The government argued to the jury, as recounted in the majority opinion:

> And so they go to a park and they drop them off at a random park.  This kid leaves and half an hour later he comes back. These grown men are putting the blame on a 17-year-old boy. Do you believe that that 17-year-old boy loaded up 128 kilograms by himself in 30 minutes?[222]

The government cannot have its cake and eat it too.  It cannot plausibly contend Castro-Hernandez's testimony would have been cumulative of the hearsay testimony of the government agents, and at the same time contend that Castro-Hernandez's statements to the agents were not believable.  The government should not be permitted to say that it accurately presented through hearsay what Castro-Hernandez would have said and then attack her purported statements as being false.  That is not "cumulative" evidence.  The jury was not permitted to judge the credibility of Castro-Hernandez's statements because she was never present in the

---

[221] *Ante*, at 15.

[222] *Ante*, at 11.

courtroom or presented via video or recording. A factfinder may well have believed every word she would have said.

The majority opinion notes that the defendants did not object to the hearsay testimony by the agents.[223] Having lost the argument that they should have been entitled to present Castro-Hernandez as a witness, why would the defendants object to testimony that, although hearsay, was material and favorable to them and the only source of these favorable facts? In any event, the lack of an objection to what was offered by the government entirely misses the point that the error at issue is the removal of a witness who possesses material evidence favorable to a criminal defendant. As discussed, the government's substitution of hearsay testimony does not cure that harm.

I would hold that the defendants made a plausible showing that Castro-Hernandez's testimony would have been material, favorable, and non-cumulative to their defense. The district court erred in denying the defendants' motions to dismiss. The majority opinion blesses an end-run around *Valenzuela-Bernal*, allowing the prosecution to usurp a defendant's right to mount an effective defense by holding that hearsay testimony offered by government agents is an adequate replacement for the testimony of a sole eyewitness. The government's good reasons for wanting to remove the witness and her young child as soon as practicable and its good faith do not change the equation. There was no balancing of those factors to be done. The defendants were entitled to due process.

---

[223] *Ante*, at 20.

No. 21-50642

\*    \*    \*

Today, the majority opinion reaches far beyond overruling the panel decision about what evidence is sufficient to prove possession under 21 U.S.C. § 841(a)(1).  Our en banc court undermines the constitutional rights of future criminal defendants who may be subject to custodial interrogation stemming from a traffic stop, who need a removable alien to testify in support of their defense, or who may touch narcotics for a purpose other than distribution.  For this reason, I respectfully dissent.